# EXHIBIT 9

1
2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF DUTCHESS
3    -----------------------------------------X
     ERIC GOLDFINE SELF-EMPLOYED
4    RETIREMENT PLAN,
5                              PLAINTIFF,
6         -against-        Index No.:
                           50591/2020
7
     68 BURNS NEW HOLDINGS, INC., GIDEON
8    RAVIV, PEOPLE OF THE STATE OF NEW YORK
     BY THE NEW YORK STATE DEPARTMENT OF
9    TAXATION AND FINANCE, JANE DOE and
     JOHN DOE,
10
                              DEFENDANTS.
11   -----------------------------------------X
     68 BURNS NEW HOLDINGS, INC.,
12
                     THIRD-PARTY PLAINTIFF,
13
          -against-
14
     334 CORP.,
15
                     THIRD-PARTY DEFENDANT.
16   -----------------------------------------X
                     DATE: AUGUST 22, 2022
17                   TIME: 1:35 P.M.
18
19
20         EXAMINATION BEFORE TRIAL of the
     Defendant, GIDEON RAVIV, taken by the
21   Plaintiff, pursuant to a Court order, held
     at Rosenberg, Fortuna & Laitman, LLP, 666
22   Old Country Road, Garden City, New York
     11530, before Robert J. Cummings, Jr., a
23   Notary Public of the State of New York.
24
25

Page 2

```
 1
 2  A P P E A R A N C E S:
 3
      McCABE & MACK, LLP
 4    Attorneys for the Plaintiff
        ERIC GOLDFINE SELF-EMPLOYED
 5      RETIREMENT PLAN
        63 Washington Street
 6      Poughkeepsie, New York 12601
        BY: RICHARD R. DuVALL, ESQ.
 7
 8  ROSENBERG, FORTUNA & LAITMAN, LLP
      Attorneys for the Third-Party Plaintiff
 9      68 Burns New Holdings, Inc.
        666 Old Country Road
10      Suite 810
        Garden City, New York 11530
11      BY: ANTHONY R. FILOSA, ESQ.
12
13
14  ALSO PRESENT:
15    Eric Goldfine
16
17
18        *       *       *
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  221. UNIFORM RULES FOR THE
       CONDUCT OF DEPOSITIONS
 3  221.1 Objections at Depositions
       (a) Objections in general. No objections
 4  shall be made at a deposition except those
    which, pursuant to subdivision (b), (c) or
 5  (d) of Rule 3115 of the Civil Practice Law
    and Rules, would be waived if not
 6  interposed, and except in compliance with
    subdivision (e) of such rule.  All
 7  objections made at a deposition shall be
    noted by the officer before whom the
 8  deposition is taken, and the answer shall
    be given and the deposition shall proceed
 9  subject to the objections and to the right
    of a person to apply for appropriate relief
10  pursuant to Article 31 of the CPLR.
       (b) Speaking objections restricted. Every
11  objection raised during a deposition shall
    be stated succinctly and framed so as not
12  to suggest an answer to the deponent and,
    at the request of the questioning attorney,
13  shall include a clear statement as to any
    defect in form or other basis of error or
14  irregularity.  Except to the extent
    permitted by CPLR Rule 3115 or by this
15  rule, during the course of the examination
    persons in attendance shall not make
16  statements or comments that interfere with
    the questioning.
17  221.2 Refusal to answer when objection is
    made. A deponent shall answer all questions
18  at a deposition, except (i) to preserve a
    privilege or right of confidentiality, (ii)
19  to enforce a limitation set forth in an
    order of the court, or (iii) when the
20  question is plainly improper and would, if
    answered, cause significant prejudice to
21  any person.  An attorney shall not direct
    a deponent not to answer except as provided
22  in CPLR Rule 3115 or this subdivision.
    Any refusal to answer or direction not to
23  answer shall be accompanied by a succinct
    and clear statement of the basis therefor.
24  If the deponent does not answer a question,
    the examining party shall have the right to
25  complete the remainder of the deposition.
```

Page 4

```
 1
 2       221. UNIFORM RULES FOR THE
            CONDUCT OF DEPOSITIONS
 3
      221.3 Communication with the deponent
 4       An attorney shall not interrupt the
         deposition for the purpose of communicating
 5  with the deponent unless all parties
       consent or the communication is made for
 6  the purpose of determining whether the
       question should not be answered on the
 7  grounds set forth in section 221.2 of these
       rules and, in such event, the reason for
 8  the communication shall be stated for the
       record succinctly and clearly.
 9
10       IT IS FURTHER STIPULATED AND AGREED
       that the transcript may be signed before
11  any Notary Public with the same force and
       effect as if signed before a clerk or a
12  Judge of the court.
13
         IT IS FURTHER STIPULATED AND AGREED
14  that the examination before trial may be
       utilized for all purposes as provided by
15  the CPLR.
16
         IT IS FURTHER STIPULATED AND AGREED
17  that all rights provided to all parties by
       the CPLR cannot be deemed waived and the
18  appropriate sections of the CPLR shall be
       controlling with respect hereto.
19
20       IT IS FURTHER STIPULATED AND AGREED
       by and between the attorneys for the
21  respective parties hereto that a copy of
       this examination shall be furnished,
22  without charge, to the attorneys
       representing the witness testifying herein.
23
24
25
```

Page 5

```
 1            G. RAVIV
 2  G I D E O N   R A V I V,  called as a
 3  witness, having been first duly sworn by a
 4  Notary Public of the State of New York, was
 5  examined and testified as follows:
 6  EXAMINATION BY
 7  MR. DUVALL:
 8      Q.   Please state your name for the
 9  record.
10      A.   Gideon Raviv.
11      Q.   What is your address?
12      A.   70-25 Yellowstone Boulevard,
13  Forest Hills, New York 11375.
14      Q.   Good afternoon, Mr. Raviv, my
15  name is Rick DuVall.  I am a lawyer for the
16  plaintiff in this case.  I have a series of
17  questions for you.
18           You were present for Mr.
19  Goldfine's deposition on Friday, is that
20  right?
21      A.   Yes.
22      Q.   You were present this morning
23  when Julian Wohlgemuth testified, is that
24  right?
25      A.   Yes.
```

G. RAVIV

1
2    Q.    So, this deposition is going to
3  proceed under the same ground rules.
4  Please take your time, make sure that I am
5  finished with my question before you start
6  your answer.
7         I would ask that you make all
8  of your responses out loud so the
9  stenographer can take everything down.
10        If you would like to take a
11 break, please just raise your hand, let me
12 know, I would be happy to let you do that.
13 I would just ask that you answer any
14 question that's pending before we do that.
15        Are those instructions all
16 clear?
17    A.    Okay.
18    Q.    Tell me, sir, are you employed
19 currently?
20    A.    What?
21    Q.    Do you have a job?  Are you
22 employed?
23    A.    I am self-employed.
24    Q.    How are you self-employed, what
25 do you do?

G. RAVIV

1
2    A.    I maintain my properties.
3    Q.    How long has that been your
4  primary occupation?
5    A.    24 years.
6    Q.    Prior to the last 24 years did
7  you work for someone or some company?
8    A.    I worked with a company.  I
9  worked.  We manufacture handbags.
10    Q.    Handbags, as in purses?
11    A.    Yes.
12    Q.    Was that your company, sir?
13    A.    Yes, sir.
14    Q.    Did you sell the company?
15    A.    No.
16    Q.    Did it go out of business?
17    A.    I stopped working, yeah.
18    Q.    24 years would be the late
19 1990's?
20    A.    1998.
21    Q.    In 1998, is that when you
22 started to acquire properties?
23    A.    Yes, sir.
24    Q.    What sort of properties did you
25 acquire?

G. RAVIV

1
2    A.    The first one I acquired I
3  Googled apartment on Burns Street in Forest
4  Hills, New York.
5    Q.    What type of properties were
6  those?
7    A.    It was 26 units, cooperative
8  apartments.
9    Q.    What was the address for those
10 apartments?
11    A.    6812, 6820, 6830, 6836, 6844
12 Burns Street.
13    Q.    Burns, B-U-R-N-S, like the name
14 of the company in this case?
15    A.    Correct.
16    Q.    Did you form 68 Burns New
17 Holdings, Inc. in order to acquire those
18 apartments?
19    A.    I acquired the company with the
20 inventory.
21    Q.    The company already owned the
22 cooperative units at the time you purchased
23 the company?
24    A.    Correct.
25    Q.    From whom did you acquire the

G. RAVIV

1
2  company?
3    A.    What?
4    Q.    Who did you acquire 68 Burns
5  New Holdings from?
6    A.    FDIC, Federal Department
7  Insurance Corporation.
8    Q.    Was that the result of a
9  foreclosure?
10    A.    I don't know what they do.  I
11 bought it from them, not from foreclosure.
12    Q.    Over the years has 68 Burns New
13 Holdings acquired other property besides
14 those cooperative units?
15    A.    Yes, sir.
16    Q.    What property is that?
17    A.    It was land mostly.
18    Q.    Was it the land in question in
19 Hyde Park, Dutchess County, New York?
20    A.    Yeah.  Other ones too.
21    Q.    Was there other real estate at
22 68 Burns acquired also?
23    A.    We acquired other in Red Hook,
24 New York, another property.
25    Q.    Does it still own that

3 (Pages 6 - 9)

G. RAVIV

1        G. RAVIV
2 property?
3   A.  No.
4   Q.  What became of that property?
5   A.  Say it again?
6   Q.  Did 68 Burns sell that Red Hook
7 property?
8   A.  Yes.
9   Q.  When was that?
10   A.  I don't recall.
11   Q.  Many years ago?
12   A.  10, 15 years ago.
13   Q.  Did 68 Burns acquire the
14 property in Hyde Park at the same time as
15 it acquired the cooperative units?
16   A.  No.
17   Q.  It acquired the Hyde Park
18 property later?
19   A.  Yes, sir.
20   Q.  Other than the cooperative
21 apartments and the Hyde Park land at
22 question in this case, and the Red Hook
23 property, has 68 Burns owned other
24 properties over the years?
25   A.  I don't recall.

1        G. RAVIV
2   Q.  Who are the shareholders of 68
3 Burns now?
4   A.  Me.
5   Q.  Nobody else?
6   A.  No.
7   Q.  Over the years has 68 Burns had
8 other shareholders besides yourself during
9 the time that you owned it?
10   A.  I had a partner in the
11 beginning between 1998 to 2000.
12   Q.  What happened to that partner's
13 shares?
14   A.  We closed the relationship
15 between us, and I bought the other side.
16   Q.  So, since then you have been
17 the only shareholder?
18   A.  Correct.
19   Q.  Are you the only employee or
20 officer of 68 Burns?
21   A.  Yes.
22   Q.  When 68 Burns acquired the
23 property at Hyde Park, do you know how much
24 you paid for it?
25   A.  305.

1        G. RAVIV
2   Q.  305,000?
3   A.  Yes.
4   Q.  Was that paid all in cash at
5 the time?
6   A.  No.  It was paid partial, then
7 they gave me a credit, and they reduced it.
8   Q.  Can you explain that, please,
9 what happened?
10   A.  They made a mistake and they
11 didn't explain exactly what was in the
12 property.  And it was something that they
13 really didn't correctly produce a real
14 understanding to the property when I bought
15 it.  And they told me everything is okay.
16 And it happened to be on the road going
17 between Route 9 to the property, there is,
18 how it's called, one part was village
19 sewage on the road, does not belong to the
20 property.  And there is a basketball field
21 on the property.  I told them to move it.
22 They said, no, we cannot move it.
23   Q.  Did this happen after you had
24 already purchased the property or was it
25 while --

1        G. RAVIV
2   A.  Well, I --
3   Q.  Please wait.
4      Did this adjustment happen
5 after you had already purchased the
6 property, or while you were in contract to
7 purchase the property?
8   A.  I was in contract.  It was
9 signed, and they got the deposit.  And
10 after that, we went to change the property
11 again, which we find it out that something is
12 wrong.
13   Q.  As a result of that do I
14 understand you correctly that the price was
15 reduced?
16   A.  Because of the defective
17 situation of the property.
18   Q.  What was the price reduced to?
19   A.  I don't remember.  255 to 150,
20 something like that.
21   Q.  Whatever that price was, was
22 that all paid to the FDIC at the closing?
23   A.  Correct.
24   Q.  Did you borrow money from
25 anyone in order to make that payment to the

G. RAVIV

2 FDIC?
3    A.   No.
4    Q.   That was in 2002, is that
5 right?
6    A.   2001, 2002.
7    Q.   Did there come a point in time
8 when 68 Burns borrowed money from 334 Corp,
9 or Stanley Gallant?
10    A.   I think it started in 2003,
11 2004.
12    Q.   How did that come about?
13    A.   We been in connection with
14 another company, and it's called SWJ, or
15 something.  They have been together, the
16 two people, and then they split.  And then
17 I don't remember the name at the moment.
18 It was another company.
19    Q.   Who did you understand were the
20 individuals involved in SWJ, or whatever it
21 was?
22    A.   You know better than me.  Give
23 me the idea.  What's the name before, and I
24 will tell you.  In the beginning in 2001
25 when the same people were another name,

G. RAVIV

2 make a loan on the apartment, they been in
3 another name.
4    Q.   What were the names of the
5 people?
6    A.   I think it was Gallant and
7 Julian Wohlgemuth, but they find themselves
8 in one combination under one umbrella with
9 another name.
10    Q.   Understood.  How did you meet
11 either Mr. Wohlgemuth or Mr. Gallant?
12    A.   I don't remember.
13    Q.   Do you know when you first met
14 either of them?
15    A.   I think I met him, Gallant, in
16 the beginning of 2001, and he came to see
17 the apartment a day in Forest Hills.
18    Q.   Did someone introduce the two
19 of you?
20    A.   I don't recall now.  That was
21 21 years ago.  My memory is not too good.
22    Q.   Well, you are going to do your
23 best, right with us today?
24    A.   Say it again?
25    Q.   You will do your best, won't

G. RAVIV

2 you?  You said your memory is not so great.
3 All I am asking you to do is try your best.
4    A.   Your memory is better than
5 mine.  I don't remember 21 years ago the
6 meeting between the two of us.
7    Q.   One other instruction, if I
8 may.  As we progress through this
9 deposition, if you remember something that
10 you didn't remember earlier, please just
11 pipe up because I am happy to have it.
12 It's not unusual that we remember something
13 as we spend time in a discussion.  If
14 that's the case, raise your hand, ask your
15 lawyer to pipe up, and we will be happy
16 either to change something if you misspoke,
17 or fill in an answer that you couldn't
18 recall earlier.  Is that all right?
19    A.   I don't know if it's all right,
20 but I have to talk to my lawyer with the
21 subject that you are asking me.
22    Q.   Okay.  So, do I understand that
23 Mr. Wohlgemuth, or some company that he was
24 with, made you a loan for the cooperative
25 units first?

G. RAVIV

2    A.   It was only the apartment,
3 period.  At this time I didn't own the
4 property.
5    Q.   Did this company, Mr.
6 Wohlgemuth's company, loan you the money to
7 help you purchase 68 Burns?
8    A.   No.
9    Q.   For what purpose did you borrow
10 money related to the apartments from Mr.
11 Wohlgemuth or his company?
12    A.   To buy out the apartment with
13 the partner.
14    Q.   What was your partner's name?
15    A.   Ziva something.  I don't
16 remember what.
17    Q.   How much was loaned by Julian
18 or his company to help you buy out Ziva?
19    A.   I think around 250,000.
20    Q.   Was that a secured loan, did it
21 have collateral?
22    A.   The apartment was collateral.
23    Q.   After that loan did you do any
24 borrowing from Julian, or any company that
25 you thought he was associated with?

G. RAVIV

2      A.   I think in 2003 or 2004 they
3   gave me additional money.
4      Q.   What purpose was that loan for?
5      A.   I don't recall.
6      Q.   Was that loan also secured?
7      A.   I don't recall.  I cannot tell
8   you what I don't remember.
9      Q.   Did there come a point in time
10   when Julian, or a company he was associated
11   with, loaned you money that was secured by
12   the property in Hyde Park?
13      A.   Yes.
14      Q.   For what purpose was that money
15   borrowed?
16      A.   To do the subdivision project.
17      Q.   Describe the property in Hyde
18   Park for us, if you could?
19      A.   Repeat the question, please?
20      Q.   My question is about the
21   property in Hyde Park.  Are there any
22   buildings on it?
23      A.   No.
24      Q.   Have there ever been any
25   buildings on it as far as you know?

G. RAVIV

2      A.   No.
3      Q.   Have you presented any
4   subdivision applications to the Town of
5   Hyde Park?
6      A.   Yes.
7      Q.   When was the last time, the
8   most recent time you were before anybody in
9   the Town of Hyde Park with respect to this
10   property?
11      A.   Ten years ago.
12      Q.   What was the status of that
13   process at that time?
14      A.   That's to do explaining.  I
15   didn't go there personally.  My engineering
16   went there.
17      Q.   Do you recall the name of your
18   engineer?
19      A.   It was Dewkett at the time.
20      Q.   D-E-W-K-E-T-T?
21      A.   I think so.  And then they
22   change it they went with another company.
23   I think from Rochester, New York.  And then
24   one from the area.
25      Q.   Did you have an attorney

G. RAVIV

2   represent you before the Planning Board?
3      A.   They present the idea.
4      Q.   Was there a lawyer on behalf of
5   you at the Planning Board?
6      A.   I cannot answer a question that
7   I can't really answer.  You submit a
8   request, and you either come to an
9   agreement with the Planning Board people,
10   or not.
11      Q.   How far did that process
12   proceed?
13      A.   I cannot say to you anything
14   because at the moment it's dead.
15      Q.   It's dead?
16      A.   Dead because the recent
17   limitations I cannot continue the process
18   in front of the Planning Board.  So, they
19   closed the file.
20      Q.   So is it your understanding
21   that you would need to file a new
22   application to get before the Planning
23   Board?
24      A.   So far we didn't file anyone.
25      Q.   But there's nothing pending

G. RAVIV

2   now, is that right?
3      A.   Correct.
4      Q.   It's not one of my exhibits,
5   but I will refer to your pleadings to march
6   through the loan process here.
7           Do you recall there was a
8   series of borrowings secured that were by
9   the Hyde Park property; do you agree to
10   that?
11      A.   I don't know what you are
12   saying.  Can you repeat?
13      Q.   In your answer you allege that
14   by 2007 the principal sum that was secured
15   by the Hyde Park property to my clients was
16   $840,000; do you recall that?
17           MR. FILOSA:  Objection.  The
18        document speak for itself.
19      Q.   Do you recall that by 2007 the
20   loan that was secured by the Hyde Park
21   property was $840,000?
22      A.   I don't believe it could be
23   because it's one with another company lend
24   me money against Hyde Park.
25      Q.   Do you recall the total being

1        G. RAVIV
2    $840,000?
3        A.    I don't recall it.
4        Q.    Do you recall the property
5    going into foreclosure?
6            MR. FILOSA:  Objection to form.
7        You can answer is.
8        Q.    Do you recall 334 Corp and
9    Stanley Gallant starting a mortgage
10    foreclosure action?
11        A.    When was it.
12        Q.    At any time?
13        A.    You know the answer.
14        Q.    Do you have a recollection of
15    that, sir?
16        A.    I have a recollection of we
17    went together in court.
18            MR. DUVALL:  Mr. Filosa, if you
19        could put before the witness the
20        Forbearance Agreement that I
21        identified as number pdf number 1.
22        And if we could mark that as
23        Plaintiff's Exhibit 1 for the
24        deposition, that would be great.
25            (Whereupon, 5/1/17 Forbearance

1        G. RAVIV
2        Agreement was deemed and subsequently
3        marked as Plaintiff's Exhibit 1 for
4        identification as of this date by the
5        Reporter.)
6        Q.    Just so we are clear, I can't
7    see what's on your table, but do you have a
8    Forbearance Agreement that entered into as
9    of May 1, 2017?
10        A.    Yes.
11        Q.    It's at the very top in the
12    little typewritten part it says NYSCEF
13    document number 11.  Do you see that?
14        A.    Yes.
15        Q.    Can you identify for the record
16    what this Exhibit 1 is?
17        A.    It's Forbearance Agreement that
18    we signed together with the lender, Gallant
19    and 334 Corp, on or about May 1, 2017.
20        Q.    On the next to last page of
21    that exhibit, is that your signature as
22    president of 68 Burns?
23        A.    Yes.
24        Q.    And also as guarantor?
25        A.    Yes.

1        G. RAVIV
2        Q.    Do you recall the process by
3    which this document came to be?  Was it
4    negotiated?
5        A.    No.
6        Q.    Did you have a lawyer that
7    represented you at the time?
8        A.    Not exactly.
9        Q.    Have you ever been represented
10    by Ariel Aminov?
11        A.    Not exactly.
12        Q.    What does "not exactly" mean?
13        A.    It means that you put pressure
14    on him to do what you want.
15        Q.    Can you answer the question,
16    sir?  Did Mr. Aminov represent you?
17        A.    You didn't hear me.  I said not
18    exactly.  It means it was partial
19    representation.  He just answer your call
20    and said to me I didn't do anything.
21    DuVall write the contract.  DuVall do
22    everything.  DuVall wants it this way, or
23    don't take it at all.  That was what Aminov
24    say.  Do you know who is DuVall?
25        Q.    Where were you when you signed

1        G. RAVIV
2    Exhibit 1?
3        A.    You put me against the wall,
4    and you asked me to sign.
5        Q.    Sir, physically where were you
6    when you signed it?
7        A.    In this world still.
8        Q.    Sorry?
9        A.    In this world.  In New York.
10        Q.    You were in New York?
11        A.    Correct.
12        Q.    Did you come to my office in
13    Poughkeepsie to sign it?
14        A.    No.
15        Q.    Have we ever met, sir?
16        A.    We met in court.
17        Q.    So, do you understand what you
18    just you said to me that you felt pressured
19    to sign Exhibit 1?
20        A.    Because the figure is not
21    correct.  The language is not correct.  And
22    when you did the contract in your way
23    without asking me whether I agree with it
24    or not, you said had take it or leave it.
25        Q.    And you took it, didn't you?

G. RAVIV

1
2     A.   I didn't have a choice.  You
3  know that.  You don't have to be smart
4  enough.  But you know exactly what you did.
5     Q.   You could have sold the
6  property, right?
7     A.   Say that again?
8         MR. FILOSA:  Objection.  Calls
9      for speculation.
10    Q.   Couldn't you have sold the
11  property?
12    A.   You know the property exists.
13    Q.   Was it for sale in 2017?
14    A.   Say that again?
15    Q.   Was the property for sale in
16  2017?
17    A.   I don't recall.  If someone put
18  it for sale, it's not me.
19    Q.   When was the first time after
20  May 1 of 2017 that you complained about
21  this agreement?
22    A.   I complained to you also in
23  writing, and you write me a stupid answer,
24  I'm sorry to say, that I didn't pay all the
25  money.  And then you got all the money.

G. RAVIV

1
2  Even you got all the money, you came to me
3  with a question - why don't you continue to
4  pay?  You are a lawyer.  You cannot read
5  the contract?  You cannot read it beyond
6  the contract completely.  When you get
7  $47,000 it's money in advance, no place in
8  the contract.  You are asking why you don't
9  pay me every month $3,000.  But the
10  contract say the top is 125.  The rest is
11  235 for closing.  We ask for a pay off
12  letter.  You didn't give it.  You forgot
13  about it.  You are not in the picture.
14  What can I say?
15         MR. DUVALL:  Could you read
16      back the question, please?
17         (Whereupon, the referred to
18      question was read back by the
19      Reporter.)
20    A.   I think in September of 2017.
21    Q.   In what form did your complaint
22  take?  Was it in writing?
23    A.   I wrote you, yes.  I wrote to
24  your partner, to the lender.  They
25  transferred to you.  I don't know what it

G. RAVIV

1
2  is you people how you work because you look
3  like you are not like a lawyer only, also
4  like a buyer.  You are wonderful.
5     Q.   When you complained, as you say
6  the fall of 2017, did you claim that you
7  were forced into this agreement?
8     A.   I think you go back to the file
9  and you read it.  I don't remember at the
10  moment.
11    Q.   Do you recall what the nature
12  of your complaint was in the fall of 2017?
13    A.   What do you like to know?
14    Q.   I'm just trying to be pretty
15  orderly, sir.  I asked you when you
16  complained first about this document,
17  Exhibit 1?
18    A.   I told you that we are in a
19  good shape.  We want to finish the deal and
20  you didn't answer about it.  You told us
21  you didn't pay enough.  Whenever you got
22  the $47,000, you asked when is the next
23  month payment for $3,000.  You don't know
24  how to add 78,000 with 47,000?  It comes to
25  125.  All the contract say you need to pay

G. RAVIV

1
2  $3,000 a month.  That was 36 month.  It's
3  only $108,000, but you get 125.  It's not
4  enough.  Continue to pay.  You don't pay.
5  It's wrong.  And it's not right to put
6  people in such a situation when you know
7  that you are wrong.  And you know how to
8  calculate it if you want to.  You forgot
9  already all the way to calculate.  You went
10  to school?  You didn't finish with school
11  to ask me how much is 78,000 plus 47,000.
12  That's in the contract, pay 125,000 for the
13  apartment.  And you had a confirmation.
14  You didn't want to give the release because
15  you didn't want to follow the contract.  At
16  the end even Julian didn't remember, says
17  that he got $78,000.  Then he sends a note
18  to me by e-mail that he got the $78,000.
19  You got $47,000, yes or no?  You can
20  answer.  You got 47,000?  In 2018 it was
21  wired to you, otherwise you would release
22  the apartment.  And you released it, but
23  not completely.  You forgot to tell your
24  customer to release also the UCC-1.  You
25  are wonderful for yourself.  You don't see

G. RAVIV

1        G. RAVIV
2 the other picture. And it's a mistake of
3 yours.
4    Q. Are you finished with your
5 answer, sir?
6    A. I answered you. That's my
7 answer.
8    Q. I didn't want to interrupt you.
9 I want to wait until you are done.
10   A. I finished.
11   Q. So, you mentioned $47,000, and
12 if I understood what you just said, you
13 said that you paid that in January of 2019?
14   A. Correct.
15   Q. Since then, how much was 68
16 Burns, or you personally, paid on this
17 loan?
18      MR. FILOSA: Hold on.
19     Objection to the form of the question
20      as being a legal conclusion.
21   Q. How much have you paid 334 Corp
22 or Stanley Gallant since January of 2019?
23   A. $78,000.
24   Q. You paid that since January
25 of 2019?

1        G. RAVIV
2   A. I paid before.
3   Q. Okay. My question, sir --
4   A. Let me answer, please. Between
5 May 1, 2017 and until the December 2018 the
6 two people got together $39,000. Each one
7 got his own pound. Looks like Julian told
8 you in the deposition, he got all the
9 money. Julian didn't get all the money.
10 Julian only got 50% of the money, and
11 Gallant got also 50% of the 78,000. So,
12 $39,000 times two is $78,000.
13      Julian, if you read the e-mail
14 what you wrote me, yes, you are correct, he
15 said to me. And then after that it was a
16 closing on the 11th of January 2019. Not
17 involving with dealing with you about the
18 foreclosing one. So much of the, what is
19 called the Forbearance Agreement. And you
20 ask him to release the leasing of the
21 apartments, but you didn't took the effort
22 to release the UCC-1. That, you didn't do.
23      MR. FILOSA: Just a minute
24     before you ask your next question.
25     Off the record.

1        G. RAVIV
2     (Whereupon, an off-the-record
3     discussion was held.)
4   Q. So, Mr. Raviv, I think I
5 understood your testimony a moment ago that
6 you had paid the two lenders each $39,000
7 between May of 2017 and January of 2019, is
8 that right?
9   A. Yes.
10   Q. Those 39 times two is 78; would
11 you agree with that?
12   A. Yes.
13   Q. Do I understand that you also
14 testified a moment ago to paying $47,000 in
15 or around January of 2019; is that right?
16   A. Yes, sir.
17   Q. Did you make that $47,000
18 payment in order to secure the release of
19 the apartments which were collateral for
20 the loan?
21   A. That was also part of according
22 to contract. It was the full payment.
23   Q. And when that payment was made
24 did you testify that I had sent to Mr.
25 Aminov the leases and the shares

1        G. RAVIV
2 representing the cooperative apartments?
3   A. Without the UCC-3.
4   Q. I heard that part also. I just
5 wanted to make sure that we were
6 understanding each other, that we had sent
7 Mr. Aminov the shares and the leases, is
8 that right?
9   A. Yes.
10   Q. Now, since that $47,000 payment
11 was made in January of 2019 have you made
12 other payments pursuant to the Forbearance
13 Agreement?
14   A. The one that was the agreement.
15   Q. The answer is no, you have made
16 no such payments?
17   A. What?
18   Q. Your answer is that you have
19 made no payments on the Forbearance
20 Agreement since January of 2019?
21   A. I made according to the
22 Forbearance Agreement all the payments that
23 were necessary according to the agreement.
24   Q. I want to make sure that we are
25 understanding each other on the facts. We

Page 34

G. RAVIV

1 can all argue about the contract. That's
2 what your lawyer gets paid to you and what
3 I get paid to you. I want to understand
4 from you just to make sure that I have
5 evidence of all payments that you have
6 made, do you understand that's the reason
7 for my questioning?
8    A.    Correct.
9    Q.    And you told me again about the
10 78,000, and I get that, and you told me
11 about the 47,000. I get that. Have you
12 made other payments since then that you
13 haven't told us about?
14       MR. FILOSA: Could you let Mr.
15    DuVall finish his question, as a
16    courtesy to Mr. DuVall and Mr.
17    Cummings?
18    A.    Go ahead.
19    Q.    I will correct your attorney.
20 You don't need to be nice to me. We all
21 need to be nice to Mr. Cummings, okay?
22       So, let me make sure my
23 question is finished. Other than the
24 78,000 you testified about, and the 47,000

Page 35

G. RAVIV

1 that was paid in January, have you made
2 other payments under the Forbearance
3 Agreement --
4    A.    No.
5    Q.    -- since the $47,000 was paid?
6    A.    No.
7    Q.    Have you paid the real estate
8 taxes since 2017?
9    A.    I don't recall.
10    Q.    Has anyone other than yourself
11 made any payments for your account on this
12 loan?
13       MR. FILOSA: Objection to the
14    form. Again, on this loan, but
15    subject to that qualification you can
16    answer.
17    A.    I don't know.
18    Q.    Nobody has told you that they
19 made any payments to 334 Corp or Stanley
20 Gallant on this loan, is that right?
21    A.    I can't answer this question,
22 I'm sorry.
23    Q.    Has anyone ever told you that
24 they paid part of this loan for you?

Page 36

G. RAVIV

1    A.    I don't recall.
2    Q.    Since you and the lenders
3 signed Exhibit 1 have you and the lenders
4 signed any other documents?
5    A.    You mean this document?
6    Q.    Since that one. After that,
7 has there been any agreement between you on
8 the one hand, and them on the other hand
9 about this loan?
10    A.    I don't recall.
11    Q.    Are you aware that we have
12 exchanged documents, discovery demands in
13 this case?
14    A.    Can you repeat, please?
15    Q.    Have you assisted your lawyer
16 in responding to our requests for documents
17 about this case?
18    A.    My lawyer?
19    Q.    Have you given Mr. Filosa all
20 of the checks and other evidence of
21 payments about this loan?
22    A.    I think yes.
23    Q.    Did anyone help you in that
24 regard assembling your records and your

Page 37

G. RAVIV

1 paperwork?
2    A.    No.
3    Q.    Have you given Mr. Filosa all
4 of the writings that were exchanged between
5 you, on the one hand, and Mr. Gallant and
6 Mr. Wohlgemuth on the other hand that we
7 asked for?
8       MR. FILOSA: Objection to the
9    form. That we asked for. Subject to
10    that qualification you can answer.
11    A.    I don't recall all of that.
12    Q.    Did you try to assemble and
13 deliver to Mr. Filosa all of those
14 materials that you could find?
15    A.    I'm sorry. I don't know.
16    Q.    Did anyone help you assemble
17 materials to respond to our discovery
18 requests in this case?
19    A.    No.
20    Q.    We could turn to Exhibit 2 is
21 the letter dated October 22, 2019.
22       (Whereupon, 10/22/19 letter was
23    deemed and subsequently marked as
24    Plaintiff's Exhibit 2 for

10 (Pages 34 - 37)

G. RAVIV

1
2      identification as of this date by the
3      Reporter.)
4      Q.   You could just tell me what you
5  have in front of you that is Exhibit 2?
6      A.   I see it, yeah.
7      Q.   For the record, because we are
8  not at the same table, I need for you to
9  say on the record what it is you are
10  looking at?
11      MR. FILOSA:  We could stipulate
12      letter on the letterhead of McCabe &
13      Mack dated October 22, 2019.  The
14      letter itself consists of two pages
15      and the first page of the exhibit is
16      just an exhibit page.
17      MR. DUVALL:  I apologize for
18      the exhibit page.  I don't mean to be
19      misleading.
20      MR. FILOSA:  No worries.
21      Q.   Mr. Raviv, did you receive this
22  letter by certified return receipt and
23  regular mail?
24      A.   I cannot recall if I got it.  I
25  see it now.

G. RAVIV

1
2      Q.   Do you have any recollection of
3  responding to it in any way?
4      A.   No.
5      Q.   Have you searched your records
6  in response to our discovery requests to
7  try to find any response that you might
8  have made to this?
9      A.   Say it again?
10      MR. DUVALL:  Can you read it
11      back, please?
12      (Whereupon, the referred to
13      question was read back by the
14      Reporter.)
15      A.   I don't recall.  At this time
16  2019 I was mostly out of country.
17      Q.   Where were you?
18      A.   In Israel.
19      Q.   Did you get e-mail while you
20  were in Israel?
21      A.   I didn't bother.  And I didn't
22  work on anything here because I have a big
23  job there.
24      Q.   What was the big job?
25      A.   I was acquiring a big place in

G. RAVIV

1
2  Israel.
3      Q.   Do you see in the second
4  paragraph of Exhibit 2 that I asked you to
5  provide proof of payment of certain real
6  estate taxes?
7      A.   Yeah.  I didn't see that.  How
8  can I answer you?
9      Q.   Whether you saw it or not, sir,
10  since October of 2019 have you ever
11  provided evidence to me, or 334 Corp, or
12  Mr. Gallant, that you have paid land taxes?
13      A.   I don't recall.
14      Q.   Have you paid any land taxes
15  since 2017?
16      A.   I don't recall.
17      Q.   We could flip forward to
18  Exhibit 4.
19      MR. FILOSA:  We are
20      intentionally omitting Exhibit 3
21      right now?
22      MR. DUVALL:  For the time
23      being, yes.
24      MR. FILOSA:  For the marking
25      purposes.

G. RAVIV

1
2      MR. DUVALL:  We will go with 4.
3      (Whereupon, Payment List was
4      deemed and subsequently marked as
5      Plaintiff's Exhibit 4 for
6      identification as of this date by the
7      Reporter.)
8      Q.   For the record Mr. Raviv what
9  is Exhibit 4 in front of you?
10      A.   I didn't hear you.  Can you
11  repeat, please?
12      Q.   Can you tell me what piece of
13  paper you have in front of you so I could
14  know what you are looking for?
15      A.   Release of money.  And the
16  release is not correct.
17      Q.   Are there payments that you
18  made that are not on that list?
19      A.   Yes.
20      Q.   Have you seen this list before?
21      A.   I see now only in front of me a
22  total of 105,500.  And it's wrong.  It's
23  missing 19,500 to make it correct.
24      Q.   So, that total should be
25  125,000?

G. RAVIV

1
2     A.   Yes, sir.
3         MR. DUVALL:  We could turn now
4     to Exhibit 5.
5         (Whereupon, extract of
6      discovery materials was deemed and
7      subsequently marked as Plaintiff's
8      Exhibit 5 for identification as of
9      this date by the Reporter.)
10    Q.   This is an extract from some
11 materials that your lawyer sent me in
12 discovery in this case.
13    A.   What do you want on this one?
14    Q.   First let's make sure we are
15 looking at the same thing.  At the bottom
16 of Exhibit 5 on the left, do you see 1 of
17 86?
18    A.   Yes.
19    Q.   And then the second page is 2
20 of 86?
21    A.   Say again?
22    Q.   On the lower left-hand corner
23 of the second page?
24    A.   Number 2 of 86.
25    Q.   So, if we could pause there on

G. RAVIV

1
2 that page where it says 2 of 86.  Who is
3 Dan R. Raviv?
4     A.   Say again?
5     Q.   About ten lines from the top it
6 says, "Purchaser/Borrower (lessee)."  It
7 has two names.  One is Dan R. Raviv and the
8 other the Ram J. Raviv; do you see that?
9     A.   Sure.
10    Q.   Who is that?
11    A.   My sons.
12    Q.   You have two sons, Dan and Ram?
13    A.   Yes.
14    Q.   What transaction, or
15 transactions, generated this document?
16    A.   They went to buy the apartment,
17 and they want to get an insurance and the
18 insurance company refused to give insurance
19 so they asked why.  They say there still is
20 a lien on the apartment.
21    Q.   What lien do you say they
22 found?
23    A.   Say it again, please?
24    Q.   What lien?
25    A.   The UCC-1 was.

G. RAVIV

1
2     Q.   At the time that the $47,000
3 was paid in 2019, was 68 Burns the owner of
4 the units?
5     A.   I was the owner, yes.
6     Q.   Was there a loan that was taken
7 out in order to get the $47,000?
8     A.   It had nothing to do one with
9 the other.
10    Q.   I'm sorry.  Was there a loan
11 that was taken out to generate the $47,000?
12 Yes or no.
13    A.   It was taking a loan, and
14 that's correct.
15    Q.   And out of that loan the
16 $47,000 was paid to my client?
17    A.   It was paid so the term, it was
18 really not a clean apartment.  They refused
19 to give it at a normal rate.  And I paid
20 them 12 plus 2%, is 14%, which shouldn't be
21 like that.
22    Q.   Was that at the 2019
23 transaction?
24    A.   January 2019.
25    Q.   You borrowed money and you

G. RAVIV

1
2 didn't like the rate, but you borrowed it
3 and you used some of that money to pay my
4 clients, right?
5     A.   What do you mean?
6         MR. DUVALL:  You can read it
7      back.  Listen to the question.
8     A.   I don't understand it.
9     Q.   What about the question don't
10 you understand, sir?
11    A.   I don't understand how you get
12 this philosophy that I really did something
13 wrong with your clients.  I don't
14 understand.
15    Q.   It's not my philosophy.  I just
16 have questions.  All I have is questions.
17       So, this title report was
18 generated in the spring of 2022, is that
19 right?
20    A.   I don't understand.
21    Q.   Looking at Exhibit 5, sir, do
22 you have Exhibit 5 in front of you?
23    A.   I didn't hear.  Say it again,
24 please.
25    Q.   You have Exhibit 5 in front of

G. RAVIV

1          G. RAVIV
2   you, is that right?
3      A.   Yeah.
4      Q.   At the top of that page 2 of 86
5   it has an effective date of March of 2022,
6   do you see that?
7      A.   Yeah.
8      Q.   Did the transaction take place
9   in March of 2022?
10     A.   Once again, they wanted to buy
11   the apartment, and they couldn't buy it.
12     Q.   Does 68 Burns still own the
13   apartment?
14     A.   No.  The lien was removed just
15   recently, I think like two weeks ago, or
16   ten days ago.  And they bought the
17   apartment.  The lien was removed.
18     Q.   When you say it was removed,
19   what happened?
20     A.   I told you.  After it was
21   removed, they purchased the apartment.
22          MR. DUVALL:  If we could turn
23      now to number 6.
24          (Whereupon, E-mail exchange,
25      Aminov and Duvall was deemed and

1          G. RAVIV
2      subsequently marked as Plaintiff's
3      Exhibit 6 for identification as of
4      this date by the Reporter.)
5      Q.   For the record, what is before
6   you as Exhibit 6?  Is Exhibit 6 an exchange
7   of e-mails between myself and Ariel Aminov.
8      A.   Yes.
9      Q.   Do you see on the first page at
10   the bottom where I am copying Julian and
11   asking Julian to e-mail Ariel an e-mail
12   that says the secured party authorized
13   Ariel Aminov to file the UCC-3; do you see
14   that?
15     A.   Ariel is not the lender.
16     Q.   That's not my question.  Do you
17   see that?
18     A.   Yeah.
19     Q.   Do you see at the top of that
20   Exhibit 6 Ariel writing quote, "Was a UCC-1
21   financing statement ever filed in the first
22   place?  Thank you."
23     A.   But they didn't do it.
24     Q.   I'm just asking you whether you
25   see the exchange that he and I had in

1          G. RAVIV
2   January of 2019, do you see that?
3      A.   Yes.  I see it.  Up to now, two
4   weeks ago, they didn't file it.
5          MR. DUVALL:  If we could turn
6      to Exhibit 7.
7          (Whereupon, Letter from 68
8      Burns to 3334 Corp was deemed and
9      subsequently marked as Plaintiff's
10      Exhibit 7 for identification as of
11      this date by the Reporter.)
12     Q.   Exhibit 7 is your letter, Mr.
13   Raviv?
14     A.   What did you ask, please?
15     Q.   I want to make sure you have in
16   front of you and what I have in front of me
17   as Exhibit 7.  Is that okay?
18     A.   Yes.
19     Q.   What is Exhibit 7?
20     A.   No.
21          MR. FILOSA:  We could stipulate
22      it's a one page letter in the lower
23      right 68Burns 000106 Bates stamped.
24      So, one page letter on New Holdings
25      letterhead.

1          G. RAVIV
2          MR. DUVALL:  Agreed.
3      Q.   Is that a letter you wrote, Mr.
4   Raviv?
5      A.   Yes, it is.
6      Q.   It is your writing?
7      A.   Yes.
8      Q.   Did you send it to 334 Corp?
9      A.   Separate, to the two partners.
10     Q.   And Mr. Gallant?
11     A.   Yes.
12     Q.   We see in that letter that you
13   are asking for the UCC lien to be removed,
14   right?
15     A.   Whatever is in the letter.  I
16   don't change anything.  It's written there
17   to remove lien.
18          MR. DUVALL:  Turning now to
19      Exhibit 8.
20          (Whereupon, e-mail exchange
21      Duvall and Rabanipour was deemed and
22      subsequently marked as Plaintiff's
23      Exhibit 8 for identification as of
24      this date by the Reporter.)
25     Q.   Do you know a lawyer by the

G. RAVIV

1
2 name of Daniel Rabanipour?
3     A.   No.  He represented the lender,
4 another lender.
5     Q.   He was the lawyer for the
6 lender, right?
7     A.   He's the lawyer for the lender.
8     Q.   He represented the lender at
9 the transaction that generated the $47,000
10 that was paid, is that right?
11    A.   What are you saying?
12         MR. DUVALL:  Please read it
13     back.
14         (Whereupon, the referred to
15      question was read back by the
16      Reporter.)
17    A.   Yes.  Yes.
18    Q.   The answer is yes?
19    A.   Yes.
20    Q.   Sir, do you see what Mr.
21 Rabanipour wrote to me on January 14, quote
22 "Please also advise if your office will be
23 recording the UCC-3, or would you like our
24 office to record?"  Do you see that?
25    A.   No.

G. RAVIV

1
2     Q.   I couldn't understand what you
3 said, sir?
4     A.   Yeah, but they didn't do it.
5     Q.   The lender's lawyer didn't do
6 it?
7     A.   I don't know what you did with
8 other people.  I know what I did, what I'm
9 supposed to get from you people.  They are
10 supposed to give me have a full release,
11 and they didn't give me the release.
12    Q.   Has this lender pursued you at
13 all because the UCC wasn't filed?
14         MR. FILOSA:  Objection to the
15      form in terms of pursued.
16    Q.   What's the name of the lender
17 that loaned you the money in January
18 of 2019?
19    A.   I don't remember exactly the
20 name.  It's a Persian name.
21    Q.   A Persian's name?
22    A.   Yeah.  I don't remember the
23 name at the moment because Daniel
24 Rabanipour he came with a company, Israeli
25 some company.  Then he came with another

G. RAVIV

1
2 two people.  I don't remember the names.
3 Mansole something, or other ones.  But I
4 didn't have a choice because the apartment
5 was not completely without, what is called,
6 without clearance, until they was ready to
7 give me the apartment.  Other people sent
8 to me the checks and they cannot do it.
9 And they could do it, the other one,
10 Israeli gave it to me at a much lower rate.
11    Q.   Has that lender demanded
12 payment from you?
13    A.   Yes.  He got all the payment.
14    Q.   Have you made all the payments
15 to that lender?
16    A.   Correct.
17    Q.   Do you still owe them money?
18    A.   No.
19    Q.   When did you pay it off?
20    A.   We paid him in two times.  One
21 in -- I don't remember it was, I believe
22 '21 May, I think.  And the other one was in
23 I believe ended in October of '21.
24    Q.   Do you have records that
25 reflect those payments?

G. RAVIV

1
2     A.   I can give you a letter from
3 them that they got all the payments.
4     Q.   I may issue a letter to your
5 lawyer asking for certain records.  I just
6 ask that you preserve all of those records
7 that you have.  All right?
8     A.   I will give you.
9     Q.   Thank you.
10         MR. DUVALL:  If we could turn
11     to Exhibit 9, please.
12         (Whereupon, E-mail exchange
13      between DuVall and Julian was deemed
14      and subsequently marked as
15      Plaintiff's Exhibit 9 for
16      identification as of this date by the
17      Reporter.)
18         MR. DUVALL:  Just for the
19      record, if you could identify
20      Exhibit 9.
21         MR. FILOSA:  We could stipulate
22      that Exhibit 9 consists of five
23      pages.  The first page at the top
24      being e-mail correspondence from
25      Richard DuVall to Jane and Julian

14 (Pages 50 - 53)

G. RAVIV

1       G. RAVIV
2    dated May 5, 2020.
3      Q.   Have you looked at this e-mail
4  exchange for a minute?
5      A.   I didn't have a chance.  This
6  is the first time.  I don't know.
7      Q.   Take a look at it now, if you
8  could?
9      A.   What is the question, please.
10      Q.   I will ask you the question
11  after you have taken a look at the e-mail,
12  if that's all right?
13      A.   It's a correspondence --
14      Q.   It's a correspondence between
15  your lawyer and myself?
16      A.   It's Ariel to you, and a copy
17  to Julian.
18      Q.   Do you see that Ariel is asking
19  Julian to authorize his office to file a
20  UCC-3 termination statements, right?
21         MR. FILOSA:  Objection to the
22      form.  The document speaks for
23      itself.
24      A.   I can't answer for Ariel.  My
25  name is Gideon Raviv.  And, unfortunately,

G. RAVIV

1       G. RAVIV
2  he did something also, not according to my
3  request, it's up to him what he is doing.
4  Everyone is in the business is doing what
5  they like to do.
6      Q.   Was something happening in May
7  of 2020 that brought the status of the
8  UCC-3 termination statements to light?
9      A.   Yes.  But maybe May '20 was to
10  sell the apartments.
11      Q.   So, do I understand that you
12  earlier testified that you thought you paid
13  off the lender in 2021?  Might it had been
14  May of 2020?
15      A.   Probably May '20.  It could be
16  May '20.
17      Q.   But again you believe you have
18  records when those payments were made in
19  connection with these e-mail exchanges?
20      A.   No doubt.  I told you what I
21  know.
22      Q.   That's all I'm asking you for,
23  sir.
24         MR. DUVALL:  If we could turn
25      to Exhibit 10, please.

G. RAVIV

1       G. RAVIV
2         (Whereupon, Authorization to
3      file UCC statement was deemed and
4      subsequently marked as Plaintiff's
5      Exhibit 10 for identification as of
6      this date by the Reporter.)
7      Q.   Have you ever seen the writing
8  that is Exhibit 10 before?
9      A.   Let me read it.  I didn't see
10  this one.
11      Q.   Do you see it now?
12      A.   I see it now.
13      Q.   When you look at Exhibit 10,
14  doesn't it look like to you that it's the
15  authorization that Ariel Aminov was asking
16  Julian to sign in May of 2020?
17         MR. FILOSA:  Objection to the
18      form.  Calls for speculation.
19      Q.   You can read, sir.  Isn't that
20  what it looks like?
21      A.   What?  I didn't hear the
22  question.  You are yelling.
23      Q.   Okay.  Doesn't it look to you,
24  sir, like Exhibit 10 is Julian signing the
25  authorization that your lawyer Ariel Aminov

G. RAVIV

1       G. RAVIV
2  was asking him to sign in May of 2020?
3      A.   I don't know what Ariel did.
4  It's nothing that came to my attention, or
5  they did something without asking me.
6      Q.   If I understand, you are suing
7  my clients for having failed to do what you
8  wanted them to do about the UCC-3, right?
9  That's part of your complaint in this case?
10      A.   I don't know.  I don't know.  I
11  cannot answer for it.  I wasn't invited to
12  do anything like that, and he shouldn't do
13  anything without conferring with me before
14  representing.  If he doesn't represent me,
15  that's the story here what you see.
16         MR. DUVALL:  If we could turn
17      now to Exhibit 11.
18         (Whereupon, E-mail exchange
19      DuVall to Aminov 5/8/20 was deemed
20      and subsequently marked as
21      Plaintiff's Exhibit 11 for
22      identification as of this date by the
23      Reporter.)
24         MR. DUVALL:  Just for the
25      record, and Anthony, for your

G. RAVIV

1
2    stipulation, we have a four page
3    e-mail exchange here.
4        MR. FILOSA:  That's correct,
5    four pages.  The top of being from
6    Richard DuVall to Ariel Aminov dated
7    May 8, 2020?
8    Q.   Have you seen any part of this
9    e-mail exchange before today, sir?
10   A.   I don't recall that I saw it
11   before.
12   Q.   Do you see that the topic of
13   the e-mail exchange is real estate taxes?
14   A.   Now I see it, but I didn't see
15   before.
16   Q.   Do you see that in May of 2020
17   I was e-mailing to Ariel Aminov saying that
18   Julian is ready to pay the real estate
19   taxes of a little over $54,000 if you
20   weren't going to do it.  Do you see that on
21   the second page?
22   A.   It says, "All I could do is
23   forward to Gideon and call him."  It
24   doesn't mean he did it.  He doesn't
25   represent me in this case.

G. RAVIV

1
2    Q.   I am not asking about the
3    substance of any communications from Mr.
4    Aminov.  But my question is, did you
5    receive this e-mail exchange at some point?
6    A.   I don't recall.
7    Q.   And you are aware, are you not,
8    that the lender paid those real estate
9    taxes in May of 2020, is that right?
10   A.   I don't know.
11   Q.   Again, as we have gone through
12   this has your memory been refreshed that
13   you actually have paid real estate taxes on
14   the Hyde Park property since 2017?
15   A.   I don't know.  And I cannot
16   answer what I don't remember.
17   Q.   Wouldn't you remember it if you
18   paid $54,000 in real estate taxes on this
19   property?
20   A.   I don't know.
21   Q.   And you are aware, sir, that
22   that's part of our complaint in this case
23   is that the owner didn't pay the real
24   estate taxes, the lender did, and that's
25   part of the default here; do you understand

G. RAVIV

1
2    that?
3        MR. FILOSA:  Objection.  The
4    pleadings speak for themselves.  You
5    are asking whether he understands the
6    pleadings?
7        MR. DUVALL:  Sure.  If he's
8    aware today that part of our claim is
9    that the owner has not paid real
10   estate taxes, and that's a default
11   under the mortgage.
12       MR. FILOSA:  Obviously that
13   states a legal conclusion.  I think
14   we can both agree the pleadings speak
15   for themselves.  Whatever allegations
16   are in the pleadings, without
17   admitting or denying, the pleadings
18   speaks for themselves.
19       MR. DUVALL:  My question of
20   witness is as he is sitting here
21   before me today whether he's aware of
22   that?
23       MR. FILOSA:  Whether he's aware
24   of contents of the pleadings?
25   Q.   Yes.  That part of the default

G. RAVIV

1
2    alleged in this complaint consists of
3    failure by the owner to pay real estate
4    taxes, are you aware of that, sir?
5    A.   I don't know.  I definitely
6    aware about what you are saying, but I am
7    not aware if we saw this letter and we know
8    about it, no.
9    Q.   My question is for the last two
10   years there has been a mortgage foreclosure
11   action pending against this property.  As
12   part of the claim in that case is that you
13   haven't paid your real estate taxes.  I
14   really want to know if you have?  Because
15   if you have, I want my client's money back
16   from the county.  If you haven't, please
17   tell me.
18   A.   I don't recall.  I'm telling
19   you from the beginning.
20   Q.   If you have paid any real
21   estate taxes since 2017 on this property,
22   would you have records that would show
23   that?
24   A.   I think you got a full set of
25   payment what I'm supposed to do,

Page 62

G. RAVIV

1
2 requirements in the Forbearance Agreement.
3        MR. DUVALL:  Can you read the
4    question back?  It's a simple
5    question.
6        (Whereupon, the referred to
7    question was read back by the
8    Reporter.)
9    A.  I think my lawyer, I don't
10 know, but I gave him all the taxes that I
11 paid according to the demands that were
12 required based on the Forbearance
13 Agreement, maintenance on the apartment,
14 taxes.  Everything was paid.
15    Q.  So, if you have evidence that
16 you paid taxes on this property, you have
17 already provided it to me in this case?
18    A.  I need to look for that.  I
19 cannot answer you.
20    Q.  You understand that we asked
21 for all of that evidence, right?
22    A.  I hear you.  I cannot answer
23 what I don't remember.
24        MR. FILOSA:  If you are at a
25    natural break point, could we take a

Page 63

G. RAVIV

1
2    five minute break?
3        MR. DUVALL:  Yes.
4        (Whereupon, a short recess was
5    taken.)
6 BY MR. DUVALL:
7    Q.  Sir, your lawyer filed an
8 answer on your behalf, on behalf of 68
9 Burns.  I am going to have a few questions
10 about the affirmative defenses.  I mostly
11 just want to make sure that I have all the
12 information that you would point to to
13 support these defenses.
14        So, you make an affirmative
15 defense, or your lawyer did on your behalf,
16 it says, "The complaint is barred by
17 documentary evidence."
18        My question, sir, are you aware
19 of any documentary evidence that you have
20 not provided to your lawyer in that regard?
21    A.  What document are you talking?
22 I don't know which document you are
23 talking.
24    Q.  Nor do I.  And your defense
25 says that there is documentary evidence

Page 64

G. RAVIV

1
2 that says we can't foreclose.  My question,
3 sir, is there any documentary evidence that
4 you are aware of that your lawyer has not
5 already provided to us?
6    A.  I cannot answer that anything
7 at all.
8    Q.  You are not aware of anything
9 that you are hiding?
10    A.  I don't believe anyone hiding
11 anything.
12    Q.  Okay.  One of the affirmative
13 defenses says that, "Plaintiff's complaint
14 is barred by the doctrine of payment."  We
15 have covered this before.  I just want to
16 make sure that you told me about all
17 payments that have been made on account of
18 this loan?
19    A.  When you say all payments on
20 the loan, it's a period of 20 years.
21    Q.  Fair point.  My question is,
22 since May of 2017 have you told me about
23 all payments that have been paid on your
24 account on this loan?
25    A.  I believe so completely.

Page 65

G. RAVIV

1
2    Q.  I may have asked this before,
3 so I apologize.  Has anyone other than 68
4 Burns made payments that you are aware of
5 on the loan that's the topic of this
6 action?
7    A.  I cannot answer that.
8        MR. FILOSA:  Objection.  Asked
9    and answered.  But again to the
10    extent you can answer again.
11    Q.  It's fair to say that you are
12 not aware of anyone else making such a
13 payment?
14    A.  I cannot answer it.  I don't
15 know because I had a period that I was
16 sick, and I didn't know what was going on.
17    Q.  Have you asked anybody who was
18 taking care of your affairs whether they
19 made any payments to 334 Corp, Stanley
20 Gallant or Mr. Goldfine's company?
21    A.  Who's Goldfine?
22    Q.  Pardon me?
23    A.  Say Goldfine company?  Who's
24 Goldfine?
25    Q.  The plaintiff Mr. Goldfine

17 (Pages 62 - 65)

Page 66

G. RAVIV

1          G. RAVIV
2  testified on Friday.  Have you made any
3  payments to Mr. Goldfine or his trust?
4          MR. FILOSA:  It's a yes or no
5     question.
6       A.  I don't know who he is.
7       Q.  You say you don't know.  The
8  plaintiff in this case is the Eric Goldfine
9  Self-Employment Retirement Plan and Trust;
10  do you see that?
11          MR. FILOSA:  We can stipulate
12     to that.  It's a yes or no question.
13       A.  I don't know.  No one told me
14  Goldfine.  No one send me a note that he
15  became the owner of the note.
16       Q.  Right.  Since then, have you
17  made any payments to him?
18       A.  I don't recall.
19       Q.  Well, we are in the middle of a
20  lawsuit, sir.  Why wouldn't you recall if
21  you made payments?
22       A.  I cannot answer it because I
23  don't remember anyone really mentioned to
24  me, or did anything.
25       Q.  Is there anybody that can

Page 67

G. RAVIV

1  answer that, sir, if you are not able to
2  provide that answer?
3       A.  From my record, he's not the
4  owner.
5       Q.  Sir, I don't want argue with
6  you.  I want to ask the question and get an
7  answer to the question.  Have you made any
8  payments to the Eric Goldfine
9  Self-Employment Retirement Plan and Trust?
10  Yes or no.
11       A.  I think it's no.
12       Q.  You think the answer is no?
13  And if you wanted to be sure, what papers
14  would you look at, or what records would
15  you go to to figure out if you were sure
16  you haven't made any payments to the
17  plaintiff?
18       A.  I answered no.
19       Q.  The answer is no, you have not
20  made any payments?
21       A.  I don't know the guy, anything.
22  Like you give me another name, it's the
23  same thing.  I don't make payments to
24  someone I'm not related to.  I don't have

Page 68

G. RAVIV

1  any connection.  I don't have any
2  responsibility.  I don't have any contact
3  with him.  So, this is it.
4       Q.  So, the answer is you made no
5  payments to him.  That's fine.  That's the
6  only answer I want.  Is that the correct
7  answer to the best of your knowledge?
8       A.  Again, I don't know the guy.
9          MR. FILOSA:  Sir, let's stop
10     the argument.  It's a yes or no
11     question.
12       A.  No.  I told you no.
13       Q.  No, you have not made any
14  payments to the plaintiff?
15       A.  No.
16          MR. FILOSA:  The plaintiff
17     being Eric Goldfine, for the clarity
18     of the record.
19          THE WITNESS:  No.
20          MR. DUVALL:  I have nothing
21     else.
22          MR. FILOSA:  No questions for
23     the witness.
24          Again, we sequentially omitted,

Page 69

G. RAVIV

1  there is no Plaintiff's 3.  We marked
2  1 through and including 11,
3  intentionally omitting number 3?
4          MR. DUVALL:  Whatever I
5  mentioned, It's in the record.
6          MR. FILOSA:  Perfect.  Thank
7  you.
8          (Whereupon, at 3:00 P.M., the
9  Examination of this witness was
10  concluded.)

°      °      °      °

Page 70

1
2        D E C L A R A T I O N
3
4      I hereby certify that having been
5   first duly sworn to testify to the truth, I
6   gave the above testimony.
7
8      I FURTHER CERTIFY that the foregoing
9   transcript is a true and correct transcript
10  of the testimony given by me at the time
11  and place specified hereinbefore.
12
13
14
           _____
15           GIDEON RAVIV
16
17
18  Subscribed and sworn to before me
19  this _____ day of _____ 20___.
20
21
      _____
22      NOTARY PUBLIC
23
24
25

Page 72

1
2        C E R T I F I C A T E
3
    STATE OF NEW YORK      )
4              : SS.:
    COUNTY OF ROCKLAND      )
5
6      I, ROBERT J. CUMMINGS, JR., a Notary
7   Public for and within the State of New
8   York, do hereby certify:
9      That the witness whose examination is
10  hereinbefore set forth was duly sworn and
11  that such examination is a true record of
12  the testimony given by that witness.
13     I further certify that I am not
14  related to any of the parties to this
15  action by blood or by marriage and that I
16  am in no way interested in the outcome of
17  this matter.
18     IN WITNESS WHEREOF, I have hereunto
19  set my hand this 30th day of August 2022.
20
21
           _____
22           ROBERT J. CUMMINGS, JR.
23
24
25

Page 71

1
2          E X H I B I T S
3
4   PLAINTIFF EXHIBITS
      EXHIBIT   EXHIBIT            PAGE
5   NUMBER    DESCRIPTION
      Exh 1   5/1/17 Forbearance Agreement   23
6   Exh 2   10/22/19 letter            38
      Exh 3   (No used during deposition)
7   Exh 4   Payment List           41
      Exh 5   Extract of Discovery materials  42
8   Exh 6   E-mail exchange Aminov & Duvall 47
      Exh 7   Letter 68 Burns to 334 Corp   48
9   Exh 8   E-mail exchange between DuVall
              and Rabanipour         50
10  Exh 9   E-mail exchange between DuVall
              and Jane and Julian     53
11  Exh 10  Authorization for File UCC   56
      Exh 11  E-mail exchange between DuVall
12            and Aminov, 5/8/20     58
13        I N D E X
14  EXAMINATION BY            PAGE
      Mr. DuVall                5
15
    INFORMATION AND/OR DOCUMENTS REQUESTED
16  INFORMATION AND/OR DOCUMENTS       PAGE
      Preserve all records           53
17
18    QUESTIONS MARKED FOR RULINGS
      PAGE LINE QUESTION
19  (None)
20
21
22
23
24
25

Page 73

1          ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
2
    CASE NAME: Eric Goldfine Self Employed Retirement Plan v. 68 Burns
    New Holdings, Inc., Et Al.
3   DATE OF DEPOSITION: 8/22/2022
    WITNESSES' NAME: Gideon Raviv
4
5   PAGE  LINE (S)     CHANGE          REASON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
             Gideon Raviv
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24
      _____
25  (NOTARY PUBLIC)       MY COMMISSION EXPIRES:

| & |
| --- |
| **&**   1:21 2:3,8 38:12 71:8 |

| 0 |
| --- |
| **000106**   48:23 |

| 1 |
| --- |
| **1**   22:21,23 23:3,9 23:16,19 25:2,19 26:20 28:17 29:24 31:5,22 36:4 42:16 43:25 47:20 69:3 71:5 |
| **10**   10:12 55:25 56:5,8,13,24 71:11 |
| **10/22/19**   37:23 71:6 |
| **105,500**   41:22 |
| **108,000**   29:3 |
| **11**   23:13 57:17 57:21 69:3 71:11 |
| **11375**   5:13 |
| **11530**   1:22 2:10 |
| **11th**   31:16 |
| **12**   44:20 |
| **125**   27:10 28:25 29:3 |
| **125,000**   29:12 41:25 |
| **12601**   2:6 |
| **14**   44:20 50:21 |
| **15**   10:12 |
| **150**   13:19 |
| **19,500**   41:23 |

| 1990's   7:19 |
| --- |
| **1998**   7:20,21 11:11 |
| **1:35**   1:17 |

| 2 |
| --- |
| **2**   37:21,25 38:5 40:4 42:19,24 43:2 44:20 46:4 71:6 |
| **20**   55:9,15,16 64:20 70:19 73:22 |
| **2000**   11:11 |
| **2001**   14:6,24 15:16 |
| **2002**   14:4,6 |
| **2003**   14:10 18:2 |
| **2004**   14:11 18:2 |
| **2007**   21:14,19 |
| **2017**   23:9,19 26:13,16,20 27:20 28:6,12 31:5 32:7 35:9 40:15 59:14 61:21 64:22 |
| **2018**   29:20 31:5 |
| **2019**   30:13,22,25 31:16 32:7,15 33:11,20 37:22 38:13 39:16 40:10 44:3,22,24 48:2 51:18 |
| **2020**   54:2 55:7 55:14 56:16 57:2 58:7,16 59:9 |

| 2021   55:13 |
| --- |
| **2022**   1:16 45:18 46:5,9 72:19 |
| **20555**   72:21 |
| **21**   15:21 16:5 52:22,23 |
| **22**   1:16 37:22 38:13 |
| **221**   3:2 4:2 |
| **221.1**   3:3 |
| **221.2**   3:17 4:7 |
| **221.3**   4:3 |
| **23**   71:5 |
| **235**   27:11 |
| **24**   7:5,6,18 |
| **250,000**   17:19 |
| **255**   13:19 |
| **26**   8:7 |

| 3 |
| --- |
| **3**   33:3 40:20 47:13 50:23 54:20 55:8 57:8 69:2,4 71:6 |
| **3,000**   27:9 28:23 29:2 |
| **305**   11:25 |
| **305,000**   12:2 |
| **30th**   72:19 |
| **31**   3:10 |
| **3115**   3:5,14,22 |
| **3334**   48:8 |
| **334**   1:14 14:8 22:8 23:19 30:21 35:20 40:11 49:8 65:19 71:8 |

| 36   29:2 |
| --- |
| **38**   71:6 |
| **39**   32:10 |
| **39,000**   31:6,12 32:6 |
| **3:00**   69:9 |

| 4 |
| --- |
| **4**   40:18 41:2,5,9 71:7 |
| **41**   71:7 |
| **42**   71:7 |
| **47**   71:8 |
| **47,000**   27:7 28:22,24 29:11 29:19,20 30:11 32:14,17 33:10 34:12,25 35:6 44:2,7,11,16 50:9 |
| **48**   71:8 |

| 5 |
| --- |
| **5**   42:4,8,16 45:21 45:22,25 54:2 71:7,14 |
| **5/1/17**   22:25 71:5 |
| **5/8/20**   57:19 71:12 |
| **50**   31:10,11 71:9 |
| **50591/2020**   1:6 |
| **53**   71:10,16 |
| **54,000**   58:19 59:18 |
| **56**   71:11 |
| **58**   71:12 |

| 6 | 9 | | |
|---|---|---|---|
| **6** 46:23 47:3,6,6 47:20 71:8 | **9** 12:17 53:11,15 53:20,22 71:10 | **agreed** 4:10,13 4:16,20 49:2 | **answered** 3:20 4:6 30:6 65:9 67:19 |
| **63** 2:5 | **a** | **agreement** 20:9 22:20 23:2,8,17 26:21 28:7 | **anthony** 2:11 57:25 |
| **666** 1:21 2:9 | **able** 67:2 | 31:19 33:13,14 | **anybody** 19:8 65:17 66:25 |
| **68** 1:7,11 2:9 8:16 9:4,12,22 10:6,13,23 11:2 11:7,20,22 14:8 17:7 23:22 30:15 44:3 46:12 48:7 63:8 65:3 71:8 73:2 | **accompanied** 3:23 | 33:20,22,23 35:4 36:8 62:2,13 71:5 | **apartment** 8:3 15:2,17 17:2,12 17:22 29:13,22 43:16,20 44:18 46:11,13,17,21 52:4,7 62:13 |
| | **account** 35:12 64:17,24 | **ahead** 34:19 | |
| | **acquire** 7:22,25 8:17,25 9:4 10:13 | **al** 73:2 | |
| | | **allegations** 60:15 | |
| | **acquired** 8:2,19 9:13,22,23 10:15 10:17 11:22 | **allege** 21:13 | **apartments** 8:8 8:10,18 10:21 17:10 31:21 32:19 33:2 55:10 |
| **6812** 8:11 | | **alleged** 61:2 | |
| **6820** 8:11 | **acquiring** 39:25 | **aminov** 24:10,16 24:23 32:25 33:7 46:25 47:7 47:13 56:15,25 57:19 58:6,17 59:4 71:8,12 | |
| **6830** 8:11 | **action** 22:10 61:11 65:6 72:15 | | **apologize** 38:17 65:3 |
| **6836** 8:11 | | | **application** 20:22 |
| **6844** 8:11 | **add** 28:24 | | **applications** 19:4 |
| **68burns** 48:23 | **additional** 18:3 | **answer** 3:8,12 3:17,17,21,22,23 3:24 6:6,13 16:17 20:6,7 21:13 22:7,13 24:15,19 26:23 28:20 29:20 30:5,7 31:4 33:15,18 35:17 35:22 37:11 40:8 50:18 54:24 57:11 59:16 62:19,22 63:8 64:6 65:7 65:10,14 66:22 67:2,3,8,13,20 68:5,7,8 | **apply** 3:9 |
| **7** | **address** 5:11 8:9 | | **appropriate** 3:9 4:18 |
| **7** 48:6,10,12,17 48:19 71:8 | **adjustment** 13:4 | | **area** 19:24 |
| **70-25** 5:12 | **admitting** 60:17 | | **argue** 34:2 67:6 |
| **78** 32:10 | **advance** 27:7 | | **argument** 68:11 |
| **78,000** 28:24 29:11,17,18 30:23 31:11,12 34:11,25 | **advise** 50:22 | | **ariel** 24:10 47:7 47:11,13,15,20 54:16,18,24 56:15,25 57:3 58:6,17 |
| | **affairs** 65:18 | | |
| | **affirmative** 63:10,14 64:12 | | |
| **8** | **afternoon** 5:14 | | **article** 3:10 |
| **8** 49:19,23 58:7 71:9 | **ago** 10:11,12 15:21 16:5 19:11 32:5,14 46:15,16 48:4 | | **asked** 25:4 28:15 28:22 37:8,10 |
| **8/22/2022** 73:3 | | | |
| **810** 2:10 | | | |
| **840,000** 21:16,21 22:2 | **agree** 21:9 25:23 32:11 60:14 | | |
| **86** 42:17,20,24 43:2 46:4 | | | |

40:4 43:19
62:20 65:2,8,17
**asking** 16:3,21
25:23 27:8
47:11,24 49:13
53:5 54:18
55:22 56:15
57:2,5 59:2 60:5
**assemble** 37:13
37:17
**assembling**
36:25
**assisted** 36:16
**associated** 17:25
18:10
**attendance** 3:15
**attention** 57:4
**attorney** 3:12,21
4:4 19:25 34:20
**attorneys** 2:4,8
4:20,22
**august** 1:16
72:19
**authorization**
56:2,15,25 71:11
**authorize** 54:19
**authorized**
47:12
**aware** 36:12
59:7,21 60:8,21
60:23 61:4,6,7
63:18 64:4,8
65:4,12

**b**

**b** 3:4,10 8:13
71:2

**back** 27:16,18
28:8 39:11,13
45:7 50:13,15
61:15 62:4,7
**barred** 63:16
64:14
**based** 62:12
**basis** 3:13,23
**basketball** 12:20
**bates** 48:23
**beginning** 11:11
14:24 15:16
61:19
**behalf** 20:4 63:8
63:8,15
**believe** 21:22
52:21,23 55:17
64:10,25
**belong** 12:19
**best** 15:23,25
16:3 68:8
**better** 14:22
16:4
**beyond** 27:5
**big** 39:22,24,25
**blood** 72:15
**board** 20:2,5,9
20:18,23
**borrow** 13:24
17:9
**borrowed** 14:8
18:15 44:25
45:2
**borrower** 43:6
**borrowing** 17:24
**borrowings** 21:8
**bother** 39:21

**bottom** 42:15
47:10
**bought** 9:11
11:15 12:14
46:16
**boulevard** 5:12
**break** 6:11 62:25
63:2
**brought** 55:7
**buildings** 18:22
18:25
**burns** 1:7,11 2:9
8:3,12,13,16 9:4
9:12,22 10:6,13
10:23 11:3,7,20
11:22 14:8 17:7
23:22 30:16
44:3 46:12 48:8
63:9 65:4 71:8
73:2
**business** 7:16
55:4
**buy** 17:12,18
43:16 46:10,11
**buyer** 28:4

**c**

**c** 2:2 3:4 70:2
72:2,2
**calculate** 29:8,9
**call** 24:19 58:23
**called** 5:2 12:18
14:14 31:19
52:5
**calls** 26:8 56:18
**care** 65:18
**case** 5:16 8:14
10:22 16:14

36:14,18 37:19
42:12 57:9
58:25 59:22
61:12 62:17
66:8 73:2
**cash** 12:4
**cause** 3:20
**certain** 40:5 53:5
**certified** 38:22
**certify** 70:4,8
72:8,13
**chance** 54:5
**change** 13:10
16:16 19:22
49:16 73:5
**charge** 4:22
**checks** 36:21
52:8
**choice** 26:2 52:4
**city** 1:22 2:10
**civil** 3:5
**claim** 28:6 60:8
61:12
**clarity** 68:18
**clean** 44:18
**clear** 3:13,23
6:16 23:6
**clearance** 52:6
**clearly** 4:8
**clerk** 4:11
**client** 44:16
**client's** 61:15
**clients** 21:15
45:4,13 57:7
**closed** 11:14
20:19
**closing** 13:22
27:11 31:16

**collateral** 17:21 17:22 32:19
**combination** 15:8
**come** 14:7,12 18:9 20:8 25:12
**comes** 28:24
**comments** 3:16
**commission** 73:25
**communicating** 4:4
**communication** 4:3,5,8
**communications** 59:3
**company** 7:7,8 7:12,14 8:14,19 8:21,23 9:2 14:14,18 16:23 17:5,6,11,18,24 18:10 19:22 21:23 43:18 51:24,25 65:20 65:23
**complained** 26:20,22 28:5,16
**complaint** 27:21 28:12 57:9 59:22 61:2 63:16 64:13
**complete** 3:25
**completely** 27:6 29:23 52:5 64:25
**compliance** 3:6
**concluded** 69:11

**conclusion** 30:20 60:13
**conduct** 3:2 4:2
**conferring** 57:13
**confidentiality** 3:18
**confirmation** 29:13
**connection** 14:13 55:19 68:2
**consent** 4:5
**consists** 38:14 53:22 61:2
**contact** 68:3
**contents** 60:24
**continue** 20:17 27:3 29:4
**contract** 13:6,8 24:21 25:22 27:5,6,8,10 28:25 29:12,15 32:22 34:2
**controlling** 4:18
**cooperative** 8:7 8:22 9:14 10:15 10:20 16:24 33:2
**copy** 4:21 54:16
**copying** 47:10
**corner** 42:22
**corp** 1:14 14:8 22:8 23:19 30:21 35:20 40:11 48:8 49:8 65:19 71:8
**corporation** 9:7

**correct** 8:15,24 11:18 13:23 21:3 25:11,21,21 30:14 31:14 34:9,20 41:16,23 44:14 52:16 58:4 68:7 70:9
**correctly** 12:13 13:14
**correspondence** 53:24 54:13,14
**country** 1:22 2:9 39:16
**county** 1:2 9:19 61:16 72:4
**course** 3:15
**court** 1:2,21 3:19 4:12 22:17 25:16
**courtesy** 34:17
**covered** 64:15
**cplr** 3:10,14,22 4:15,17,18
**credit** 12:7
**cummings** 1:22 34:18,22 72:6,21
**currently** 6:19
**customer** 29:24

**d**

**d** 3:5 5:2 19:20 70:2 71:13
**dan** 43:3,7,12
**daniel** 50:2 51:23
**date** 1:16 23:4 38:2 41:6 42:9 46:5 47:4 48:11

49:24 53:16 56:6 57:22 73:3
**dated** 37:22 38:13 54:2 58:6
**day** 15:17 70:19 72:19 73:22
**days** 46:16
**dead** 20:14,15,16
**deal** 28:19
**dealing** 31:17
**december** 31:5
**deemed** 4:17 23:2 37:24 41:4 42:6 46:25 48:8 49:21 53:13 56:3 57:19
**default** 59:25 60:10,25
**defect** 3:13
**defective** 13:16
**defendant** 1:15 1:20
**defendants** 1:10
**defense** 63:15,24
**defenses** 63:10 63:13 64:13
**definitely** 61:5
**deliver** 37:14
**demanded** 52:11
**demands** 36:13 62:11
**denying** 60:17
**department** 1:8 9:6
**deponent** 3:12 3:17,21,24 4:3,5
**deposit** 13:9

**deposition**   3:4,7
    3:8,8,11,18,25
    4:4 5:19 6:2
    16:9 22:24 31:8
    71:6 73:3
**depositions**   3:2,3
    4:2
**describe**   18:17
**description**   71:5
**determining**   4:6
**dewkett**   19:19
**direct**   3:21
**direction**   3:22
**discovery**   36:13
    37:18 39:6 42:6
    42:12 71:7
**discussion**   16:13
    32:3
**doctrine**   64:14
**document**   21:18
    23:13 24:3
    28:16 36:6
    43:15 54:22
    63:21,22
**documentary**
    63:17,19,25 64:3
**documents**   36:5
    36:13,17 71:15
    71:16
**doe**   1:9,9
**doing**   55:3,4
**doubt**   55:20
**duly**   5:3 70:5
    72:10
**dutchess**   1:2
    9:19
**duvall**   2:6 5:7,15
    22:18 24:21,21

24:22,24 27:15
34:16,17 38:17
39:10 40:22
41:2 42:3 45:6
46:22,25 48:5
49:2,18,21 50:12
53:10,13,18,25
55:24 57:16,19
57:24 58:6 60:7
60:19 62:3 63:3
63:6 68:21 69:5
71:8,9,10,11,14

**e**

**e**   2:2,2 3:6 5:2
    19:20,20 29:18
    31:13 39:19
    46:24 47:7,11,11
    49:20 53:12,24
    54:3,11 55:19
    57:18 58:3,9,13
    58:17 59:5 70:2
    71:2,8,9,10,11
    71:13 72:2,2
**earlier**   16:10,18
    55:12
**effect**   4:11
**effective**   46:5
**effort**   31:21
**either**   15:11,14
    16:16 20:8
**employed**   1:3
    2:4 6:18,22,23
    6:24 73:2
**employee**   11:19
**employment**
    66:9 67:10

**ended**   52:23
**enforce**   3:19
**engineer**   19:18
**engineering**
    19:15
**entered**   23:8
**eric**   1:3 2:4,15
    66:8 67:9 68:18
    73:2
**errata**   73:1
**error**   3:13
**esq**   2:6,11
**estate**   9:21 35:8
    40:6 58:13,18
    59:8,13,18,24
    60:10 61:3,13,21
**et**   73:2
**event**   4:7
**evidence**   34:6
    36:21 40:11
    62:15,21 63:17
    63:19,25 64:3
**exactly**   12:11
    24:8,11,12,18
    26:4 51:19
**examination**
    1:20 3:15 4:14
    4:21 5:6 69:10
    71:14 72:9,11
**examined**   5:5
**examining**   3:24
**exchange**   46:24
    47:6,25 49:20
    53:12 54:4
    57:18 58:3,9,13
    59:5 71:8,9,10
    71:11

**exchanged**   36:13
    37:5
**exchanges**   55:19
**exh**   71:5,6,6,7,7
    71:8,8,9,10,11
    71:11
**exhibit**   22:23
    23:3,16,21 25:2
    25:19 28:17
    36:4 37:21,25
    38:5,15,16,18
    40:4,18,20 41:5
    41:9 42:4,8,16
    45:21,22,25 47:3
    47:6,6,20 48:6
    48:10,12,17,19
    49:19,23 53:11
    53:15,20,22
    55:25 56:5,8,13
    56:24 57:17,21
    71:4,4
**exhibits**   21:4
    71:4
**exists**   26:12
**expires**   73:25
**explain**   12:8,11
**explaining**   19:14
**extent**   3:14
    65:10
**extract**   42:5,10
    71:7

**f**

**f**   72:2
**facts**   33:25
**failed**   57:7
**failure**   61:3

fair  64:21 65:11
fall  28:6,12
far  18:25 20:11
  20:24
fdic  9:6 13:22
  14:2
federal  9:6
felt  25:18
field  12:20
figure  25:20
  67:16
file  20:19,21,24
  28:8 47:13 48:4
  54:19 56:3
  71:11
filed  47:21 51:13
  63:7
fill  16:17
filosa  2:11 21:17
  22:6,18 26:8
  30:18 31:23
  34:15 35:14
  36:20 37:4,9,14
  38:11,20 40:19
  40:24 48:21
  51:14 53:21
  54:21 56:17
  58:4 60:3,12,23
  62:24 65:8 66:4
  66:11 68:10,17
  68:23 69:7
finance  1:9
financing  47:21
find  13:11 15:7
  37:15 39:7
fine  68:6
finish  28:19
  29:10 34:16

finished  6:5 30:4
  30:10 34:24
first  5:3 8:2
  15:13 16:25
  26:19 28:16
  38:15 42:14
  47:9,21 53:23
  54:6 70:5
five  53:22 63:2
flip  40:17
follow  29:15
follows  5:5
forbearance
  22:20,25 23:8,17
  31:19 33:12,19
  33:22 35:3 62:2
  62:12 71:5
force  4:11
forced  28:7
foreclose  64:2
foreclosing
  31:18
foreclosure  9:9
  9:11 22:5,10
  61:10
foregoing  70:8
forest  5:13 8:3
  15:17
forgot  27:12
  29:8,23
form  3:13 8:16
  22:6 27:21
  30:19 35:15
  37:10 51:15
  54:22 56:18
forth  3:19 4:7
  72:10

fortuna  1:21 2:8
forward  40:17
  58:23
found  43:22
four  58:2,5
framed  3:11
friday  5:19 66:2
front  20:18 38:5
  41:9,13,21 45:22
  45:25 48:16,16
full  32:22 51:10
  61:24
furnished  4:21
further  4:10,13
  4:16,20 70:8
  72:13

g

g  5:1,2 6:1 7:1
  8:1 9:1 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1

65:1 66:1 67:1
  68:1 69:1
gallant  14:9 15:6
  15:11,15 22:9
  23:18 30:22
  31:11 35:21
  37:6 40:12
  49:10 65:20
garden  1:22 2:10
general  3:3
generate  44:11
generated  43:15
  45:18 50:9
gideon  1:7,20
  5:10 54:25
  58:23 70:15
  73:3,21
give  14:22 27:12
  29:14 43:18
  44:19 51:10,11
  52:7 53:2,8
  67:23
given  3:8 36:20
  37:4 70:10
  72:12
go  7:16 19:15
  28:8 34:19 41:2
  67:16
going  6:2 12:16
  15:22 22:5
  58:20 63:9
  65:16
goldfine  1:3 2:4
  2:15 65:21,23,24
  65:25 66:3,8,14
  67:9 68:18 73:2
goldfine's  5:19
  65:20

**good** 5:14 15:21
  28:19
**googled** 8:3
**great** 16:2 22:24
**ground** 6:3
**grounds** 4:7
**guarantor** 23:24
**guy** 67:22 68:9

**h**

**h** 71:2
**hand** 6:11 16:14
  36:9,9 37:6,7
  42:22 72:19
**handbags** 7:9,10
**happen** 12:23
  13:4
**happened** 11:12
  12:9,16 46:19
**happening** 55:6
**happy** 6:12
  16:11,15
**hear** 24:17 41:10
  45:23 56:21
  62:22
**heard** 33:4
**held** 1:21 32:3
**help** 17:7,18
  36:24 37:17
**hereinbefore**
  70:11 72:10
**hereto** 4:18,21
**hereunto** 72:18
**hiding** 64:9,10
**hills** 5:13 8:4
  15:17
**hold** 30:18

**holdings** 1:7,11
  2:9 8:17 9:5,13
  48:24 73:2
**hook** 9:23 10:6
  10:22
**hyde** 9:19 10:14
  10:17,21 11:23
  18:12,17,21 19:5
  19:9 21:9,15,20
  21:24 59:14

**i**

**idea** 14:23 20:3
**identification**
  23:4 38:2 41:6
  42:8 47:3 48:10
  49:23 53:16
  56:5 57:22
**identified** 22:21
**identify** 23:15
  53:19
**ii** 3:18
**iii** 3:19
**improper** 3:20
**include** 3:13
**including** 69:3
**index** 1:6
**individuals**
  14:20
**information**
  63:12 71:15,16
**instruction** 16:7
**instructions** 6:15
**insurance** 9:7
  43:17,18,18
**intentionally**
  40:20 69:4

**interested** 72:16
**interfere** 3:16
**interposed** 3:6
**interrupt** 4:4
  30:8
**introduce** 15:18
**inventory** 8:20
**invited** 57:11
**involved** 14:20
**involving** 31:17
**irregularity** 3:14
**israel** 39:18,20
  40:2
**israeli** 51:24
  52:10
**issue** 53:4

**j**

**j** 1:22 43:8 72:6
  72:21
**jane** 1:9 53:25
  71:10
**january** 30:13
  30:22,24 31:16
  32:7,15 33:11,20
  35:2 44:24 48:2
  50:21 51:17
**job** 6:21 39:23
  39:24
**john** 1:9
**jr** 1:22 72:6,21
**judge** 4:12
**julian** 5:23 15:7
  17:17,24 18:10
  29:16 31:7,9,10
  31:13 47:10,11
  53:13,25 54:17
  54:19 56:16,24

58:18 71:10

**k**

**k** 19:20
**know** 6:12 9:10
  11:23 14:22
  15:13 16:19
  18:25 21:11
  22:13 24:24
  26:3,4,12 27:25
  28:13,23 29:6,7
  35:18 37:16
  41:14 49:25
  51:7,8 54:6
  55:21 57:3,10,10
  59:10,15,20 61:5
  61:7,14 62:10
  63:22 65:15,16
  66:6,7,13 67:22
  68:9
**knowledge** 68:8

**l**

**l** 70:2
**laitman** 1:21 2:8
**land** 9:17,18
  10:21 40:12,14
**language** 25:21
**late** 7:18
**law** 3:5
**lawsuit** 66:20
**lawyer** 5:15
  16:15,20 20:4
  24:6 27:4 28:3
  34:3 36:16,19
  42:11 49:25
  50:5,7 51:5 53:5
  54:15 56:25
  62:9 63:7,15,20

64:4
**leases** 32:25 33:7
**leasing** 31:20
**leave** 25:24
**left** 42:16,22
**legal** 30:20 60:13
**lend** 21:23
**lender** 23:18
  27:24 47:15
  50:3,4,6,7,8
  51:12,16 52:11
  52:15 55:13
  59:8,24
**lender's** 51:5
**lenders** 32:6
  36:3,4
**lessee** 43:6
**letter** 27:12
  37:22,23 38:12
  38:14,22 48:7,12
  48:22,24 49:3,12
  49:15 53:2,4
  61:7 71:6,8
**letterhead** 38:12
  48:25
**lien** 43:20,21,24
  46:14,17 49:13
  49:17
**light** 55:8
**limitation** 3:19
**limitations** 20:17
**line** 71:18 73:5
**lines** 43:5
**list** 41:3,18,20
  71:7
**listen** 45:7
**little** 23:12 58:19

**llc** 73:1
**llp** 1:21 2:3,8
**loan** 15:2 16:24
  17:6,20,23 18:4
  18:6 21:6,20
  30:17 32:20
  35:13,15,21,25
  36:10,22 44:6,10
  44:13,15 64:18
  64:20,24 65:5
**loaned** 17:17
  18:11 51:17
**long** 7:3
**look** 28:2 54:7
  54:11 56:13,14
  56:23 62:18
  67:15
**looked** 54:3
**looking** 38:10
  41:14 42:15
  45:21
**looks** 31:7 56:20
**loud** 6:8
**lower** 42:22
  48:22 52:10

**m**

**mack** 2:3 38:13
**mail** 29:18 31:13
  38:23 39:19
  46:24 47:11,11
  49:20 53:12,24
  54:3,11 55:19
  57:18 58:3,9,13
  59:5 71:8,9,10
  71:11
**mailing** 58:17

**mails** 47:7
**maintain** 7:2
**maintenance**
  62:13
**making** 65:12
**mansole** 52:3
**manufacture** 7:9
**march** 21:5 46:5
  46:9
**mark** 22:22
**marked** 23:3
  37:24 41:4 42:7
  47:2 48:9 49:22
  53:14 56:4
  57:20 69:2
  71:18
**marking** 40:24
**marriage** 72:15
**materials** 37:15
  37:18 42:6,11
  71:7
**matter** 72:17
**mccabe** 2:3
  38:12
**mean** 24:12 36:6
  38:18 45:5
  58:24
**means** 24:13,18
**meet** 15:10
**meeting** 16:6
**memory** 15:21
  16:2,4 59:12
**mentioned** 30:11
  66:23 69:6
**met** 15:13,15
  25:15,16
**middle** 66:19

**mine** 16:5
**minute** 31:23
  54:4 63:2
**misleading**
  38:19
**missing** 41:23
**misspoke** 16:16
**mistake** 12:10
  30:2
**moment** 14:17
  20:14 28:10
  32:5,14 51:23
**money** 13:24
  14:8 17:6,10
  18:3,11,14 21:24
  26:25,25 27:2,7
  31:9,9,10 41:15
  44:25 45:3
  51:17 52:17
  61:15
**month** 27:9
  28:23 29:2,2
**morning** 5:22
**mortgage** 22:9
  60:11 61:10
**move** 12:21,22

**n**

**n** 2:2 5:2 8:13
  70:2 71:13
**name** 5:8,15
  8:13 14:17,23,25
  15:3,9 17:14
  19:17 50:2
  51:16,20,20,21
  51:23 54:25
  67:23 73:2,3

| | | | |
|---|---|---|---|
| **names** 15:4 43:7 52:2 | **objections** 3:3,3 3:3,7,9,10 | 47:9 48:22,24 53:23 58:2,21 | **partner's** 11:12 17:14 |
| **natural** 62:25 | **obviously** 60:12 | 71:4,14,16,18 | **partners** 49:9 |
| **nature** 28:11 | **occupation** 7:4 | 73:5 | **party** 1:12,15 |
| **necessary** 33:23 | **october** 37:22 | **pages** 38:14 | 2:8 3:24 47:12 |
| **need** 20:21 28:25 | 38:13 40:10 | 53:23 58:5 | **pause** 42:25 |
| 34:21,22 38:8 | 52:23 | **paid** 11:24 12:4 | **pay** 26:24 27:4,9 |
| 62:18 | **office** 25:12 | 12:6 13:22 | 27:11 28:21,25 |
| **negotiated** 24:4 | 50:22,24 54:19 | 30:13,16,21,24 | 29:4,4,12 45:3 |
| **new** 1:2,7,8,8,11 | **officer** 3:7 11:20 | 31:2 32:6 34:3,4 | 52:19 58:18 |
| 1:22,23 2:6,9,10 | **okay** 6:17 12:15 | 35:2,6,8,25 | 59:23 61:3 |
| 5:4,13 8:4,16 | 16:22 31:3 | 40:12,14 44:3,16 | **paying** 32:14 |
| 9:5,12,19,24 | 34:22 48:17 | 44:17,19 50:10 | **payment** 13:25 |
| 19:23 20:21 | 56:23 64:12 | 52:20 55:12 | 28:23 32:18,22 |
| 25:9,10 48:24 | **old** 1:22 2:9 | 59:8,13,18 60:9 | 32:23 33:10 |
| 72:3,7 73:1,2 | **omitted** 68:25 | 61:13,20 62:11 | 40:5 41:3 52:12 |
| **nice** 34:21,22 | **omitting** 40:20 | 62:14,16 64:23 | 52:13 61:25 |
| **normal** 44:19 | 69:4 | **paper** 41:13 | 64:14 65:13 |
| **notary** 1:23 4:11 | **once** 46:10 | **papers** 67:14 | 71:7 |
| 5:4 70:22 72:6 | **ones** 9:20 52:3 | **paperwork** 37:2 | **payments** 33:12 |
| 73:25 | **order** 1:21 3:19 | **paragraph** 40:4 | 33:16,19,22 34:6 |
| **note** 29:17 66:14 | 8:17 13:25 | **pardon** 65:22 | 34:13 35:3,12,20 |
| 66:15 | 32:18 44:7 | **park** 9:19 10:14 | 36:22 41:17 |
| **noted** 3:7 | **orderly** 28:15 | 10:17,21 11:23 | 52:14,25 53:3 |
| **number** 22:21 | **outcome** 72:16 | 18:12,18,21 19:5 | 55:18 64:17,19 |
| 22:21 23:13 | **owe** 52:17 | 19:9 21:9,15,20 | 64:23 65:4,19 |
| 42:24 46:23 | **owned** 8:21 | 21:24 59:14 | 66:3,17,21 67:9 |
| 69:4 71:5 | 10:23 11:9 | **part** 12:18 23:12 | 67:17,21,24 68:6 |
| **nyscef** 23:12 | **owner** 44:3,5 | 32:21 33:4 | 68:15 |
| | 59:23 60:9 61:3 | 35:25 57:9 58:8 | **pdf** 22:21 |
| **o** | 66:15 67:5 | 59:22,25 60:8,25 | **pending** 6:14 |
| **o** 5:2 70:2 | | 61:12 | 20:25 61:11 |
| **objection** 3:11 | **p** | **partial** 12:6 | **people** 1:8 14:16 |
| 3:17 21:17 22:6 | **p** 2:2,2 | 24:18 | 14:25 15:5 20:9 |
| 26:8 30:19 | **p.m.** 1:17 69:9 | **parties** 4:5,17,21 | 28:2 29:6 31:6 |
| 35:14 37:9 | **page** 23:20 38:15 | 72:14 | 51:8,9 52:2,7 |
| 51:14 54:21 | 38:16,18 42:19 | **partner** 11:10 | **perfect** 69:7 |
| 56:17 60:3 65:8 | 42:23 43:2 46:4 | 17:13 27:24 | |

**period** 17:3
  64:20 65:15
**permitted** 3:14
**persian** 51:20
**persian's** 51:21
**person** 3:9,21
**personally** 19:15
  30:16
**persons** 3:15
**philosophy**
  45:12,15
**physically** 25:5
**picture** 27:13
  30:2
**piece** 41:12
**pipe** 16:11,15
**place** 27:7 39:25
  46:8 47:22
  70:11
**plainly** 3:20
**plaintiff** 1:5,12
  1:21 2:4,8 5:16
  65:25 66:8
  67:18 68:15,17
  71:4
**plaintiff's** 22:23
  23:3 37:25 41:5
  42:7 47:2 48:9
  49:22 53:15
  56:4 57:21
  64:13 69:2
**plan** 1:4 2:5 66:9
  67:10 73:2
**planning** 20:2,5
  20:9,18,22
**pleadings** 21:5
  60:4,6,14,16,17
  60:24

**please** 5:8 6:4,11
  12:8 13:3 16:10
  18:19 27:16
  31:4 36:15
  39:11 41:11
  43:23 45:24
  48:14 50:12,22
  53:11 54:9
  55:25 61:16
**plus** 29:11 44:20
**point** 14:7 18:9
  59:5 62:25
  63:12 64:21
**poughkeepsie**
  2:6 25:13
**pound** 31:7
**practice** 3:5
**prejudice** 3:20
**present** 2:14
  5:18,22 20:3
**presented** 19:3
**preserve** 3:18
  53:6 71:16
**president** 23:22
**pressure** 24:13
**pressured** 25:18
**pretty** 28:14
**price** 13:14,18
  13:21
**primary** 7:4
**principal** 21:14
**prior** 7:6
**privilege** 3:18
**probably** 55:15
**proceed** 3:8 6:3
  20:12
**process** 19:13
  20:11,17 21:6

  24:2
**produce** 12:13
**progress** 16:8
**project** 18:16
**proof** 40:5
**properties** 7:2
  7:22,24 8:5
  10:24
**property** 9:13,16
  9:24 10:2,4,7,14
  10:18,23 11:23
  12:12,14,17,20
  12:21,24 13:6,7
  13:10,17 17:4
  18:12,17,21
  19:10 21:9,15,21
  22:4 26:6,11,12
  26:15 59:14,19
  61:11,21 62:16
**provide** 40:5
  67:3
**provided** 3:21
  4:14,17 40:11
  62:17 63:20
  64:5
**public** 1:23 4:11
  5:4 70:22 72:7
  73:25
**purchase** 13:7
  17:7
**purchased** 8:22
  12:24 13:5
  46:21
**purchaser** 43:6
**purpose** 4:4,6
  17:9 18:4,14
**purposes** 4:14
  40:25

**purses** 7:10
**pursuant** 1:21
  3:4,10 33:12
**pursued** 51:12
  51:15
**put** 22:19 24:13
  25:3 26:17 29:5

## q

**qualification**
  35:16 37:11
**question** 3:20,24
  4:6 6:5,14 9:18
  10:22 18:19,20
  20:6 24:15 27:3
  27:16,18 30:19
  31:3,24 34:16,24
  35:22 39:13
  45:7,9 47:16
  50:15 54:9,10
  56:22 59:4
  60:19 61:9 62:4
  62:5,7 63:18
  64:2,21 66:5,12
  67:7,8 68:12
  71:18
**questioning** 3:12
  3:16 34:8
**questions** 3:17
  5:17 45:16,16
  63:9 68:23
  71:18
**quote** 47:20
  50:21

## r

**r** 2:2,6,11 5:2
  8:13 43:3,7 70:2
  72:2

**rabanipour**
49:21 50:2,21
51:24 71:9
**raise** 6:11 16:14
**raised** 3:11
**ram** 43:8,12
**rate** 44:19 45:2
52:10
**raviv** 1:8,20 5:1
5:10,14 6:1 7:1
8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1,4 33:1 34:1
35:1 36:1 37:1
38:1,21 39:1
40:1 41:1,8 42:1
43:1,3,7,8 44:1
45:1 46:1 47:1
48:1,13 49:1,4
50:1 51:1 52:1
53:1 54:1,25
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:15 73:3,21
**read** 27:4,5,15
27:18 28:9
31:13 39:10,13
45:6 50:12,15
56:9,19 62:3,7

**ready** 52:6 58:18
**real** 9:21 12:13
35:8 40:5 58:13
58:18 59:8,13,18
59:23 60:9 61:3
61:13,20
**really** 12:13 20:7
44:18 45:12
61:14 66:23
**reason** 4:7 34:7
73:5
**recall** 10:10,25
15:20 16:18
18:5,7 19:17
21:7,16,19,25
22:3,4,8 24:2
26:17 28:11
35:10 36:2,11
37:12 38:24
39:15 40:13,16
58:10 59:6
61:18 66:18,20
**receipt** 38:22
**receive** 38:21
59:5
**recess** 63:4
**recollection**
22:14,16 39:2
**record** 4:8 5:9
23:15 31:25
32:2 38:7,9 41:8
47:5 50:24
53:19 57:25
67:4 68:19 69:6
72:11
**recording** 50:23
**records** 36:25
39:5 52:24 53:5

53:6 55:18
61:22 67:15
71:16
**red** 9:23 10:6,22
**reduced** 12:7
13:15,18
**refer** 21:5
**referred** 27:17
39:12 50:14
62:6
**reflect** 52:25
**refreshed** 59:12
**refusal** 3:17,22
**refused** 43:18
44:18
**regard** 36:25
63:20
**regular** 38:23
**related** 17:10
67:25 72:14
**relationship**
11:14
**release** 29:14,21
29:24 31:20,22
32:18 41:15,16
51:10,11
**released** 29:22
**relief** 3:9
**remainder** 3:25
**remember** 13:19
14:17 15:12
16:5,9,10,12
17:16 18:8 28:9
29:16 51:19,22
52:2,21 59:16,17
62:23 66:23
**remove** 49:17

**removed** 46:14
46:17,18,21
49:13
**repeat** 18:19
21:12 36:15
41:11
**report** 45:17
**reporter** 23:5
27:19 38:3
39:14 41:7 42:9
47:4 48:11
49:24 50:16
53:17 56:6
57:23 62:8
**reporting** 73:1
**represent** 20:2
24:16 57:14
58:25
**representation**
24:19
**represented** 24:7
24:9 50:3,8
**representing**
4:22 33:2 57:14
**request** 3:12
20:8 55:3
**requested** 71:15
**requests** 36:17
37:19 39:6
**required** 62:12
**requirements**
62:2
**respect** 4:18
19:9
**respective** 4:21
**respond** 37:18
**responding**
36:17 39:3

**response** 39:6,7
**responses** 6:8
**responsibility** 68:3
**rest** 27:10
**restricted** 3:10
**result** 9:8 13:13
**retirement** 1:4 2:5 66:9 67:10 73:2
**return** 38:22
**richard** 2:6 53:25 58:6
**rick** 5:15
**right** 3:9,18,24 5:20,24 14:5 15:23 16:18,19 21:2 26:6 29:5 32:8,15 33:8 35:21 40:21 45:4,19 46:2 48:23 49:14 50:6,10 53:7 54:12,20 57:8 59:9 62:21 66:16
**rights** 4:17
**road** 1:22 2:9 12:16,19
**robert** 1:22 72:6 72:21
**rochester** 19:23
**rockland** 72:4
**rosenberg** 1:21 2:8
**route** 12:17
**rule** 3:5,6,14,15 3:22

**rules** 3:2,5 4:2,7 6:3
**rulings** 71:18

**s**

**s** 2:2 8:13 71:2 73:5
**sale** 26:13,15,18
**saw** 40:9 58:10 61:7
**saying** 21:12 50:11 58:17 61:6
**says** 23:12 29:16 43:2,6 47:12 58:22 63:16,25 64:2,13
**school** 29:10,10
**searched** 39:5
**second** 40:3 42:19,23 58:21
**section** 4:7
**sections** 4:18
**secure** 32:18
**secured** 17:20 18:6,11 21:8,14 21:20 47:12
**see** 15:16 23:7 23:13 29:25 38:6,25 40:3,7 41:21 42:16 43:8 46:6 47:9 47:13,17,19,25 48:2,3 49:12 50:20,24 54:18 56:9,11,12 57:15 58:12,14,14,16 58:20 66:10

**seen** 41:20 56:7 58:8
**self** 1:3 2:4 6:23 6:24 66:9 67:10 73:2
**sell** 7:14 10:6 55:10
**send** 49:8 66:14
**sends** 29:17
**sent** 32:24 33:6 42:11 52:7
**separate** 49:9
**september** 27:20
**sequentially** 68:25
**series** 5:16 21:8
**set** 3:19 4:7 61:24 72:10,19
**sewage** 12:19
**shape** 28:19
**shareholder** 11:17
**shareholders** 11:2,8
**shares** 11:13 32:25 33:7
**sheet** 73:1
**short** 63:4
**show** 61:22
**sick** 65:16
**side** 11:15
**sign** 25:4,13,19 56:16 57:2
**signature** 23:21 72:21
**signed** 4:10,11 13:9 23:18 24:25 25:6 36:4

36:5
**significant** 3:20
**signing** 56:24
**simple** 62:4
**sir** 6:18 7:12,13 7:23 9:15 10:19 22:15 24:16 25:5,15 28:15 30:5 31:3 32:16 40:9 42:2 45:10 45:21 50:20 51:3 55:23 56:19,24 58:9 59:21 61:4 63:7 63:18 64:3 66:20 67:2,6 68:10
**sitting** 60:20
**situation** 13:17 29:6
**smart** 26:3
**sold** 26:5,10
**sons** 43:11,12
**sorry** 25:8 26:24 35:23 37:16 44:10
**sort** 7:24
**speak** 21:18 60:4 60:14
**speaking** 3:10
**speaks** 54:22 60:18
**specified** 70:11
**speculation** 26:9 56:18
**spend** 16:13
**split** 14:16

| | | | |
|---|---|---|---|
| **spring** 45:18 | **submit** 20:7 | **taken** 1:20 3:8 | 27:20 28:8 32:4 |
| **ss** 72:4 | **subscribed** | 44:6,11 54:11 | 36:23 46:15 |
| **stamped** 48:23 | 70:18 73:22 | 63:5 | 52:22 60:13 |
| **stanley** 14:9 22:9 | **subsequently** | **talk** 16:20 | 61:24 62:9 |
| 30:22 35:20 | 23:2 37:24 41:4 | **talking** 63:21,23 | 67:12,13 |
| 65:19 | 42:7 47:2 48:9 | **taxation** 1:9 | **third** 1:12,15 2:8 |
| **start** 6:5 | 49:22 53:14 | **taxes** 35:9 40:6 | **thought** 17:25 |
| **started** 7:22 | 56:4 57:20 | 40:12,14 58:13 | 55:12 |
| 14:10 | **substance** 59:3 | 58:19 59:9,13,18 | **time** 1:17 6:4 |
| **starting** 22:9 | **succinct** 3:23 | 59:24 60:10 | 8:22 10:14 11:9 |
| **state** 1:2,8,8,23 | **succinctly** 3:11 | 61:4,13,21 62:10 | 12:5 14:7 16:13 |
| 5:4,8 72:3,7 | 4:8 | 62:14,16 | 17:3 18:9 19:7,8 |
| **stated** 3:11 4:8 | **suggest** 3:12 | **tell** 6:18 14:24 | 19:13,19 22:12 |
| **statement** 3:13 | **suing** 57:6 | 18:7 29:23 38:4 | 24:7 26:19 |
| 3:23 47:21 56:3 | **suite** 2:10 | 41:12 61:17 | 39:15 40:22 |
| **statements** 3:16 | **sum** 21:14 | **telling** 61:18 | 44:2 54:6 70:10 |
| 54:20 55:8 | **support** 63:13 | **ten** 19:11 43:5 | **times** 31:12 |
| **states** 60:13 | **supposed** 51:9 | 46:16 | 32:10 52:20 |
| **status** 19:12 55:7 | 51:10 61:25 | **term** 44:17 | **title** 45:17 |
| **stenographer** | **supreme** 1:2 | **termination** | **today** 15:23 58:9 |
| 6:9 | **sure** 6:4 33:5,24 | 54:20 55:8 | 60:8,21 |
| **stipulate** 38:11 | 34:5,23 42:14 | **terms** 51:15 | **told** 12:15,21 |
| 48:21 53:21 | 43:9 48:15 60:7 | **testified** 5:5,23 | 28:18,20 31:7 |
| 66:11 | 63:11 64:16 | 32:14 34:25 | 34:10,11,14 |
| **stipulated** 4:10 | 67:14,16 | 55:12 66:2 | 35:19,24 46:20 |
| 4:13,16,20 | **swj** 14:14,20 | **testify** 32:24 | 55:20 64:16,22 |
| **stipulation** 58:2 | **sworn** 5:3 70:5 | 70:5 | 66:13 68:13 |
| **stop** 68:10 | 70:18 72:10 | **testifying** 4:22 | **top** 23:11 27:10 |
| **stopped** 7:17 | 73:22 | **testimony** 32:5 | 43:5 46:4 47:19 |
| **story** 57:15 | | 70:6,10 72:12 | 53:23 58:5 |
| **street** 2:5 8:3,12 | **t** | **thank** 47:22 53:9 | **topic** 58:12 65:5 |
| **stupid** 26:23 | **t** 19:20,20 70:2 | 69:7 | **total** 21:25 41:22 |
| **subdivision** 3:4 | 71:2 72:2,2 | **therefor** 3:23 | 41:24 |
| 3:6,22 18:16 | **table** 23:7 38:8 | **thing** 42:15 | **town** 19:4,9 |
| 19:4 | **take** 6:4,9,10 | 67:24 | **transaction** |
| **subject** 3:9 | 24:23 25:24 | **think** 14:10 15:6 | 43:14 44:23 |
| 16:21 35:16 | 27:22 46:8 54:7 | 15:15 17:19 | 46:8 50:9 |
| 37:10 | 62:25 | 18:2 19:21,23 | |

| | | | |
|---|---|---|---|
| **transactions** 43:15 | **umbrella** 15:8 | 43:17 48:15 | **write** 24:21 |
| **transcript** 4:10 | **understand** | 61:14,15 63:11 | 26:23 |
| 70:9,9 | 13:14 14:19 | 64:15 67:6,7 | **writing** 26:23 |
| **transferred** | 16:22 25:17 | 68:7 | 27:22 47:20 |
| 27:25 | 32:13 34:4,7 | **wanted** 33:5 | 49:6 56:7 |
| **trial** 1:20 4:14 | 45:8,10,11,14,20 | 46:10 57:8 | **writings** 37:5 |
| **true** 70:9 72:11 | 51:2 55:11 57:6 | 67:14 | **written** 49:16 |
| **trust** 66:3,9 | 59:25 62:20 | **wants** 24:22 | **wrong** 13:12 |
| 67:10 | **understanding** | **washington** 2:5 | 29:5,7 41:22 |
| **truth** 70:5 | 12:14 20:20 | **way** 24:22 25:22 | 45:13 |
| **try** 16:3 37:13 | 33:6,25 | 29:9 39:3 72:16 | **wrote** 27:23,23 |
| 39:7 | **understands** | **weeks** 46:15 | 31:14 49:3 |
| **trying** 28:14 | 60:5 | 48:4 | 50:21 |
| **turn** 37:21 42:3 | **understood** | **went** 13:10 | |
| 46:22 48:5 | 15:10 30:12 | 19:16,22 22:17 | **x** |
| 53:10 55:24 | 32:5 | 29:9 43:16 | **x** 1:3,11,16 71:2 |
| 57:16 | **unfortunately** | **whereof** 72:18 | 71:13 |
| **turning** 49:18 | 54:25 | **wired** 29:21 | |
| **two** 14:16 15:18 | **uniform** 3:2 4:2 | **witness** 4:22 5:3 | **y** |
| 16:6 31:6,12 | **units** 8:7,22 9:14 | 22:19 60:20 | **yeah** 7:17 9:20 |
| 32:6,10 38:14 | 10:15 16:25 | 68:20,24 69:10 | 38:6 40:7 46:3,7 |
| 43:7,12 46:15 | 44:4 | 72:9,12,18 | 47:18 51:4,22 |
| 48:3 49:9 52:2 | **unusual** 16:12 | **witnesses'** 73:3 | **years** 7:5,6,18 |
| 52:20 61:9 | **utilized** 4:14 | **wohlgemuth** | 9:12 10:11,12,24 |
| **type** 8:5 | | 5:23 15:7,11 | 11:7 15:21 16:5 |
| **typewritten** | **v** | 16:23 17:11 | 19:11 61:10 |
| 23:12 | **v** 5:2,2 73:2 | 37:7 | 64:20 |
| | **veritext** 73:1 | **wohlgemuth's** | **yelling** 56:22 |
| **u** | **village** 12:18 | 17:6 | **yellowstone** 5:12 |
| **u** 8:13 | | **wonderful** 28:4 | **york** 1:2,8,8,22 |
| **ucc** 29:24 31:22 | **w** | 29:25 | 1:23 2:6,10 5:4 |
| 33:3 43:25 | **w** 19:20 | **work** 7:7 28:2 | 5:13 8:4 9:19,24 |
| 47:13,20 49:13 | **wait** 13:3 30:9 | 39:22 | 19:23 25:9,10 |
| 50:23 51:13 | **waived** 3:5 4:17 | **worked** 7:8,9 | 72:3,8 73:1 |
| 54:20 55:8 56:3 | **wall** 25:3 | **working** 7:17 | |
| 57:8 71:11 | **want** 24:14 | **world** 25:7,9 | **z** |
| | 28:19 29:8,14,15 | **worries** 38:20 | **ziva** 17:15,18 |
| | 30:8,9 33:24 | | |
| | 34:4 42:13 | | |

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to
the witness for examination and shall be read to or
by him or her, and any changes in form or substance
which the witness desires to make shall be entered
at the end of the deposition with a statement of
the reasons given by the witness for making them.
The deposition shall then be signed by the witness
before any officer authorized to administer an
oath. If the witness fails to sign and return the
deposition within sixty days, it may be used as
fully as though signed. No changes to the
transcript may be made by the witness more than
sixty days after submission to the witness for
examination.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.